5ws315
149 378

## Clippinger *against* Hepbaugh.

A contract to procure or endeavour to procure the passage of an Act of the Legislature by any sinister means, or by using personal influence with the members, is void, as being inconsistent with public policy and the integrity of our political institutions.

ERROR to the Common Pleas of *Cumberland* county.

Samuel Hepbaugh, Esq. against Jacob Clippinger. This action was founded upon the following written agreement:

" On the condition of Samuel Hepbaugh succeeding before the Legislature of this State, in procuring a law authorizing myself and wife to sell the real estate devised to my wife and her children, under the will of Dr Alexander Stewart, deceased, and investing the money in our discretion for the benefit of our said children, I do hereby promise to pay the said Samuel Hepbaugh or order $100, as witness my hand and seal, January 16th 1839.

" JACOB CLIPPINGER, [SEAL.]"

Alexander Stewart made his last will and testament the 22d of June 1830. It was proved and letters testamentary issued to the widow and son-in-law, Hugh Long, as executors. Among other devises and bequests to his wife and children, was the following: " I give and bequeath to my daughter, Isabella Clippinger, wife

of Jacob Clippinger, during her natural life, and at her death to her children, and their heirs in fee-simple for ever, all my farm, part of it in Southampton township, Cumberland county, and part of it in Southampton township, Franklin county; adjoining lands of Patrick Hays, John Clippinger and Joseph Culbertson; the place that she and her husband now lives on, to be for her and her family's use during her natural life, and her children and their heirs to enjoy it at her death. I do also bequeath to my daughter, Isabella Clippinger, upon the same conditions as above-mentioned, 50 acres of my pine lands next the Baltimore road, and north of the lower furnace, adjoining lands of George Clippinger, &c. She is to have and enjoy the use of it during her natural life, and at her death her children and their heirs in fee-simple, are to enjoy it."

In pursuance of the agreement, Hepbaugh drew and prepared the requisite petition, which was signed by the defendant and wife, and the widow and heirs of the testator, returned to Hepbaugh, and by him with the other requisite testimony taken to Harrisburg; and after he had expended much labour and time in explaining the case to the judiciary committees, and appeared five or six times before them, and drawn up an Act of Assembly to meet the views and wishes of Jacob Clippinger and in accordance with the truth and facts of the case, the committees being fully satisfied of the propriety of granting the prayer of Jacob Clippinger, reported the said Act to the Legislature, which was regularly passed by that body and approved as before referred to. Since the passage of said Act, Clippinger entered into recognizances agreeably to its provisions, and subsequently sold the estate devised.

The following is a copy of the Act of Assembly referred to, passed the 24th of January, 1839: Sect. 5. "That Jacob Clippinger and Isabella his wife, late Isabella Stewart, daughter of Dr Alexander Stewart, late of the borough of Shippensburg, deceased, be and are hereby authorized and empowered to sell the real estate devised by the said Dr Alexander Stewart, deceased, to the said Isabella and her children, and to execute deed or deeds or conveyances to the purchaser or purchasers thereof, which said deed or deeds regularly executed by the said Jacob Clippinger and his wife, shall vest the fee-simple estate in the pine properties to the purchaser or purchasers thereof. Provided, however, that no such sale of the property aforesaid, shall be valid or effectual in vesting the fee-simple estate in the properties aforesaid in the purchaser or purchasers thereof, unless the said Jacob Clippinger previous to the execution and delivery of the deed or deeds as aforesaid, shall enter into recognizance in the Orphans' Court of the said county of Cumberland, in such sum as the said court shall deem proper, conditioned for the faithful investment of the proceeds of such sale, so as aforesaid: authorized to be made, in

[Clippinger v. Hepbaugh.]

other landed property for the benefit and use of the children of the said Isabella Clippinger, after the death of the said Isabella."

- The court below were of opinion that the plaintiff was entitled to recover, and gave the following opinion:

The relation of attorney or counsellor and client is by no means limited to the business of courts or judicial proceedings. The services rendered are often of a character not pertaining at all to any litigated subject, and whether they be in writing a will, giving counsel to his client respecting a contract about to be entered into, preparing a brief or arguing a question before a committee of the Legislature, his services are as valuable as if bestowed upon the trial of a cause involving the interests of his client to an equal amount. What those services are worth and whether the amount shall be certain or contingent, is a fair subject of contract between the parties. And as in this case there is no allegation of unfairness, we are bound to presume the defendant knew the amount of talent his business required, the time and attention it would require, the importance to heirs of the object to be attained, and of his ability to pay for it. The practice of making the amount of compensation contingent upon the result of the services rendered has been of such long standing and so universally pursued, that we are led to the conclusion that it is best adapted to the interests of the client. We are not aware of any rule of law or public policy which forbids a man from contracting to pay for services of any kind a sum contingent upon the result of the benefit he may derive from them. The parties, then, in this case, having fixed by their contract the amount to be paid, the only question that remains is,—was there anything illegal in the subject-matter of the contract or the service to be performed?

It is argued that it is against sound policy to sanction the exercise of any influence to procure legislative action, executive clemency, or judicial favour. As a general principle, we think this position is sound, but with this qualification, that the act done must be corrupting in its influence or prejudicial to the public interest; and we may thus illustrate our views: where a petition had been presented to Parliament against the return of a member, on the ground of bribery, an agreement by the petitioner, in consideration of a sum of money paid to him, to proceed no further, is illegal. 4 *W. & M.* 361. A contract founded upon a promise to procure signatures and obtain a pardon from the Governor is unlawful. *Hatzfield* v. *Gulden,* (7 *Watts* 152). An agreement in consideration of suppressing evidence or compounding a crime, is void. *Collins* v. *Blantern,* (2 *Wils.* 347); *Harding* v. *Cooper,* (1 *Stark. Rep.* 467). In the first case the public interests were deeply involved in the development of the facts with regard to the purity of the election. In the next case there was purchasing for a price the means of imposition upon the executive: and in the last it was effectually to prevent the punish-

v.—2 b *

ment of crime. But strip these same acts of all influence upon public interests or morals, and they lose their illegal character. An agreement founded upon the consideration of withdrawing opposition to a *private bill* in Parliament is not illegal. *Vauxhall Bridge Company* v. *The Earl Spencer,* (4 *Con. Eng. Chan.* 28). An agreement not to oppose a railway bill in Parliament is not illegal. *Edwards* v. *Grand Junction Railway Company,* (10 *Con. Eng. Cha.* 85). Nor can it be doubted that one who would carry a petition to the Governor, or convey the petition for clemency himself there, would be entitled to his promised reward: and nothing is clearer or more common than that an advocate is entitled to compensation for the exercise of his talent and ingenuity in the cause of his client at the bar of justice.

In this case then, there is nothing in the character of the contract itself which makes it any more objectionable than if the service was to be rendered in the trial of a cause in court; nor had it any tendency whatever to produce improper influence. The plaintiff rendered the service required of him, and the defendant got the benefit of it to his entire satisfaction. We are therefore of opinion he is bound to pay according to the terms of his contract. The parties have not chosen to raise or discuss any other question than the one thus disposed of. We therefore render a judgment for the plaintiff as per statement filed.

*Reed,* for plaintiff in error, argued that there was no distinction founded in good morals or sound judicial policy, between the exercise of influence in procuring the passage of a public law and a private Act of Assembly: both the one and the other amount to nothing short of an agreement to exercise an illegitimate influence on the members, which is inconsistent with public policy, and therefore, legally void. 6 *Dana* 366. But the service rendered was of no value, for the Act when passed was perfectly nugatory, and gave no additional right or estate to the defendant. 5 *Cruise Tit. Alienation by Record, Pl.* 21, 37, 49; 2 *Johns.* 263; 8 *Johns.* 556; 2 *Bl. Com.* 345; 7 *Watts* 153; 3 *Wils. Rep.* 483; 3 *Stor. on Const.* 1393; *Chit. on Con.* 673.

*Biddle,* contra, contended that no question of public policy could arise out of a circumstance so purely of a private nature, and that the distinction was well taken between a public and private act: and here it was not alleged that any improper influence was used or imposition practised. 4 *Con. Eng. Chan. Rep.* 28; 10 *Ibid.* 85; 2 *Bl. Com.* 278.

The opinion of the Court was delivered by

ROGERS, J.—The practice which has generally obtained in this State, to allow a contingent compensation for legal services, has been a subject of regret, nor am I aware of any direct decision by

[Clippinger v. Hepbaugh.]

which the practice has received judicial sanction in our courts. But conceding the principle to be as is assumed, it is very certain that it has not yet been extended to the allowance of a compensation for services in our legislative halls. The point, therefore, comes before us, untrammelled either by inveterate practice or authoritative decisions. Such services, be it remembered, are not confined to the legal profession. They are common to every class of citizens, and if we should give countenance and a legal sanction to this attempt, which is the entering wedge, it is impossible to foretell the train of evils of which it may be the prolific parent. Already is there too much reason to believe that this indispensable branch of government, without which our whole political fabric would crumble into ruins, has in some instances been contaminated by sinister and improper influences brought to bear on members, and no doubt having their source in the direct and indirect efforts of individuals retained under the hope of reward in the event of success. It cannot be avoided that such influences, privately and secretly exerted under false and covert pretences, must operate deleteriously on legislative action; and of this truth, unfortunately, our annals (I do not speak of this State alone) have afforded some melancholy proofs. There is at least a wide-spread and growing suspicion of legislative integrity, which of itself is an evil of no little magnitude. Its pernicious tendency seems to be admitted as to public bills, but a distinction is taken between them and private acts. That the latter may not prove so pernicious as the former, (of which, by the bye, I am by no means satisfied), may be conceded without danger to the argument; but the principle, with which alone we have to do, is the same. When it is recollected that, with the rapid increase of wealth and population, such Acts have greatly multiplied, and have assumed an importance before unknown; and when it is remembered (with all due respect be it spoken) that comparatively so little care is taken in the preparation of private bills, or in giving notice to persons interested in the examination of the evidence on which they are founded, that the *information* of members is derived, altogether or in part, from the applicant himself, and the secret whisperings of his friends; we cannot be too much on our guard against them, nor insist too strongly on the necessity of preserving, as far as can be done, the source from which the evidence on which they act is obtained. It would not be becoming in us to lend our aid in a transaction which may be founded in corruption, and steeped in fraud.

These remarks are not to be understood as having any relation to the case in hand, for no suspicion is entertained that anything out of the ordinary course took place in respect to this bill. Yet it cannot escape observation that even here an inducement was not wanting to an improper, or at least personal influence, or deceptive acts, to procure the success of the measure. The temptation may be small here, but it has not always been confined within

such narrow limits, as there is great reason to fear.   We do not say, it is not necessary to the case to say, that a certain compensation for such services may not be recovered; but we are clearly of opinion that it would be against sound policy to sanction a practice which may lead to secret, improper and corrupt tampering with legislative action.   It is not required that it tends to corruption: if its effect is to mislead, it is decisive against the claim; and that such is its tendency, no human being can reasonably doubt.   In *Hatzfield* v. *Gulden*, (7 *Watts* 152), it is decided that a contract, founded on a promise and agreement to procure signatures and obtain a pardon from the governor, is unlawful, and cannot be enforced by action.   This case is very pertinent, for if it is essential to the purity of the government to protect the governor from imposition in the exercise of the executive functions, it is equally so to extend the same protection to the members of the Legislature.   It is of the first consequence that they should not be deceived, that they should be protected from the arts and misrepresentations of designing men, having an interest to mislead them from the paths of duty.

It is therefore most erroneous to assume, as is done by the plaintiff's counsel, that a practice, leading to such consequences, is not contrary to private interest and public morals.   The reverse is too true; for already has a class of persons arisen, at the seat of the general government and elsewhere, who make it a business to push through private claims, for a compensation greatly, if not entirely, dependent on success.   How demoralizing this may be, it needs not the gift of prophecy to foretell.   Nay, more; we feel its effects, for it is impossible to shut our eyes at the consequences of this, with other causes, daily developing themselves in the decline of justice and public morals.   How easy the transition from private individuals to the members themselves, it would not be difficult to divine; but we are not left to conjecture, for we are not without examples, which it would be invidious to mention, but which are too well known.   Whatever abuses may exist elsewhere, we hope the judicial tribunals of the country may be kept pure, without suspicion even, that they may never be induced under a pretence to countenance vice, or lend their sanction to a principle, the inevitable effect of which will be to increase, if it does not create, fraud and misrepresentation.   In the face of many painful examples to the contrary, it is idle to say that individual, extraneous influence, acting secretly upon the members of the Legislature, is not pernicious to the best interests of society.   Its direct tendency is to sap the foundations of all morality.   And we are not without authority in a sister State, 6 *Dana* 366, where this point has been considered.   The court, it is true, decided in favour of the plaintiff; but it was on the special grounds, that it did not appear that the fee was contingent, nor that the plaintiff was expected or required to do anything he might not lawfully have done, or that

[Clippinger v. Hepbaugh.]

he had any personal or pecuniary interest in the success of the application to the Legislature.

The whole reasoning of the court, however, goes to establish these propositions, which cannot be reasonably denied. That the law will not aid in enforcing any contract that is illegal, or the consideration of which is inconsistent with public policy and sound morality, or the integrity of the domestic, civil or political institutions of a State. That a contract to procure or endeavour to procure the passage of an Act of the Legislature, by any sinister means, or even by using personal influence with the members, would be void, as being inconsistent with public policy and the integrity of our political institutions. And any agreement for a contingent fee, to be paid on the passage of a legislative Act, would be illegal and void, because it would be a strong incentive to the exercise of personal and sinister influences to effect the object. These are broad fundamental principles, to the truth of which we subscribe, and which cover the whole ground on which this case rests. It matters not that nothing improper was done or was expected to be done by the plaintiff. It is enough that such is the tendency of the contract, that it is contrary to sound morality and public policy, leading necessarily, in the hands of designing and corrupt men, to improper tampering with members, and the use of an extraneous, secret influence over an important branch of the government. It may not corrupt all ; but if it corrupts or tends to corrupt some, or if it deceives or tends to deceive or mislead some, that is sufficient to stamp its character with the seal of reprobation before a judicial tribunal.

Two cases have been cited, adverse, as is supposed, to this view of the case: *The Vauxhall Bridge Co.* v. *Earl Spencer*, (4 *Con. E. C. R.* 28), *Jacob* 64; 10 *Ib.* 85, 7 *Simons* 337. In the first, it is ruled that securities given to persons who would be prejudiced by the passage of a private bill in Parliament, in consideration of their withdrawing their opposition to it, are not illegal. In the last, that an agreement not to oppose a railway is not illegal. The projectors of a railway, pending a bill in Parliament for incorporating them, having made an agreement on behalf of the proposed corporation, in consequence of which a threatened opposition to the bill was withdrawn, it was held that the corporation, having received the benefit of the agreement, was bound by it. The last case was ruled on the authority of the first; and if it was the case of a secret agreement, withheld from the knowledge of the committee to whom the subject was committed, I cannot say that I am altogether satisfied with the decision. Nor do I see much force in the observation, that because only one member may have been dissatisfied with the bill, *non constat* it would have had any influence on the house. But, be this as it may, it is put upon special grounds, that it was merely an agreement to compensate the opposing party for what it was apprehended they might lose by the passage of the

[Clippinger v. Hepbaugh.]

Act; and if it were a private affair merely, in which the public had no interest, it might be well enough. Reliance was also had, as it seems, on a practice which obtains in Parliament, of passing such bills when the parties can agree about them. The chancellor seems to have thought that it was a matter in which the public had no interest, that it was neither against sound morality nor public policy. And if he is right in these positions, his conclusions cannot be gainsaid. But in this radical distinction consists the difference of the cases.

Besides, it would be unsafe to rely on a precedent coming from such a source, when we reflect upon the different *manner* of conducting such business in the respective countries. The contrast is indeed striking. In England, a private Act of Parliament is in the nature of a common assurance, and the passage of such an Act is conducted in some measure with the forms and circumspection of a judicial proceeding. In this State it is notoriously otherwise. In both houses, in England, they are carried on with great deliberation and caution, particularly in the House of Lords; they are usually referred to two judges, to examine and report the facts alleged, and to settle all technical forms. Nothing is done without the consent, expressly given, of all parties in being, and capable of consent, that have the remotest interest in the matter, unless such consent shall appear to be perversely, and without reason, withheld. An equivalent in money, or other estate, is usually settled upon infants, or persons not *in esse*, or not of capacity to act for themselves, who are to be concluded by the Act. And a general saving is constantly added, at the close of the bill, of the right and interest of all persons whatsoever, except those whose consent is so given and purchased, and who are therein particularly named. And yet, notwithstanding all the precautions used, alarm has been felt at the frequency of Acts of Parliament of a private nature, lest the good old rules which are the best security for property should be shaken; and wishes have been expressed from the highest quarter, that men might not have too much reason to fear that the settlements which they make of their estates shall be too easily unsettled, when they are dead, by the power of Parliament.

If there is reason to fear this in England, how much more so in this State, where but little precaution is used—where, not unfrequently, such Acts are passed with but little examination, on the private representations of persons who have a direct interest to misrepresent and deceive. And of the danger to property arising from this source, this case presents a proof; for it is certain that this Act, and others that might be named, so loosely drawn, containing so little security for the rights of infants, would not have passed the Parliament of England, nor the Legislature of this State, if properly conned and scrutinized, without the assent or even hearing of the parties principally to be affected by it. I say

[Clippinger v. Hepbaugh.]

without the hearing of the infants, for I count but little the assent of the parent who had an interest adverse to them. It is remarkable, too, that the bill passed without any saving clause, which, although not absolutely necessary, yet would have shown some regard to the rights of persons who were not in a capacity to pro- tect themselves.

Judgment reversed, and judgment for defendant.