Harris *v.* Roof's Executors.

———•-◦-•———

SAME TERM. *Before the same Justices.*

HARRIS *vs.* ROOF'S EXECUTORS.

No action will lie for services as a *lobby-agent,* in attending to a claim against the state, before the legislature ; agreements in respect to such services being against public policy, and prejudicial to sound legislation.

There being no legal services to be performed, and consequently nothing deserved, no recovery can be had in such a case, on the ground of a *quantum meruit.*

The *opinions* of witnesses, as to the value of a party's services in attending the legislature in support of a claim against the state, are not proper evidence.

MOTION by the defendants to set aside the report of a referee. It appeared that the referee allowed the claims of the plaintiff, to the amount of $771,85, and a set-off of $183. Four items allowed were as follows :

"1845.  Harris' services at Albany,    .    .    . $200 00
              Expenses and fare six times, $4,00, not included
                 in the $200, .    .    .    .    .    . 24 00
  1846.  Harris' services at Albany,    .    .    . 175 00
  1847.     do      do      do    .    .    . 200 00"

One Matchin testified, that J. Roof, the testator, pretended to have a claim against the state for land, the share of a tract contained in an Indian deed belonging to one Matthier, who gave a deed to one Schremling in 1762, who deeded to John Roof in 1788.  The land was described as lying on the south side of the Mohawk.  Matchin entered into an agreement in September, 1844, to get the claim of the heirs of John Roof to the land allowed, for one-tenth, if he succeeded, but to receive nothing if he failed.  That the plaintiff was to assist the witness all he could.  That Harris did assist some at Albany, and in the fall of 1845, the testator requested him to give up the matter to the plaintiff.  That there was a report of the secretary of state, attorney general and surveyor general, in 1845, and he believed a report was made in the house, got up by the plaintiff's means. That he gave up the business to the plaintiff in the fall of 1845, and the testator told him, the plaintiff had engaged to get the claim allowed.  And that in 1845, the plaintiff helped the witness look up the papers in relation to the claim, in the assembly papers, and he had known him to speak to members of assembly. That he was before a committee on the subject, in 1846, and heard him explain to the committee, and heard him conversing with members, in 1847.  And the witness thought the plaintiff's services, before the legislature in 1845, were worth $200, beside traveling expenses; $175, in 1846, and $200, in 1847. That the witness had had some experience for several years in this kind of business.  J. R. Rose, Esq. testified that he, the witness, was clerk of the assembly in 1845, and saw the plaintiff frequently at Albany that year, engaged in prosecuting this claim; and also in 1846; and he thought his services worth $250 in 1845.  One Snow testified that he was occasionally at Albany in 1845, 1846 and 1847, and that the plaintiff's services were worth $300 in 1845; $200 in 1846, and $200 in 1847.

That he assisted the plaintiff in the matter. These witnesses were not able to specify, very particularly, the nature or items of the services of the plaintiff. Some of the witnesses stated that they had heard the testator say, he had agreed with the plaintiff to assist him in obtaining this claim. Witnesses were called to show that the plaintiff was at Albany but very little, and that very little was done in the matter, and the application was wholly unsuccessful; and that he had admitted that he was to have nothing unless he succeeded. Testimony was also given upon the other items of account. And deducting the allowances for these services at Albany, the plaintiff, according to the finding of the referee, was indebted to the testator.

On the trial, the defendants objected to questions put to the witnesses, calling for an opinion as to the value of these services; which objections were overruled. The referee reported the sum of $588,85, as due to the plaintiff.

*H. Adams.* for the defendant.

*T. B. Mitchell,* for the plaintiff.

*By the Court,* HAND, J. I think the referee took a view of the testimony, somewhat favorable to the plaintiff upon the question of fact. But perhaps there is not such a preponderance, as to authorize us to interfere on that ground. The defendant objects, that the witnesses were asked for, and gave their opinions as to the value of the plaintiff's services, in attending the legislature. On questions of science, skill and trade, persons of skill in those branches, are sometimes allowed to give their opinions. And so as to the value of property. The foundation of the evidence in all these cases, is knowledge; without knowledge the witness is incompetent. In this case, the question to each witness was: "From what you know of Mr. Harris' services in prosecuting that claim that year, what were they worth?" If this question is admissible at all, I do not think it was shown that the witnesses had sufficient knowledge, either of these services, or the value of such services, to answer the question.

Matchin testified that he had some experience in that kind of business, for several years. But he did not pretend that he had ever heard of any compensation being made for such services, or any services of that nature. Nor even that he had ever heard any estimate put upon them. He was to have one-tenth, if successful, otherwise nothing.

Rose appears a little better prepared to speak upon the subject of value, generally, for he says that in 1846 he was not connected with the house, except in prosecuting claims for others. And again, that his estimates were not made exclusively with reference to the items of services, &c., but also with reference to what he and others had been paid for similar services.

Snow does not appear to have had much experience, nor any knowledge of the price or value of such services, and yet he swears to $300 for 1845, and $200 for each of the succeeding years. True, he appears to have been about there each year, and says that in 1846, he assisted the plaintiff, at his request; and that in 1847, the witness did not have much to do with it. He does not state that he has ever had any other experience, or that he has any knowledge, even by hearsay, of the value of such services. Giving to the plaintiff the greatest latitude in such cases, the testimony was inadmissible. A witness acquainted with some of the facts only, is not qualified to make a general estimate of the value of the whole service. It would not be allowed that one who had a knowledge of a small portion of the services of an attorney in a cause, should give an opinion of the value of his services in the entire suit. The services may be more or less, and so, I presume, it would be in cases of the kind now under consideration. There could be no uniform standard of value in such cases. If the witnesses knew of the performance, by the plaintiff, of any particular acts, and had given an opinion as to the value of those particular services, that would have presented a different question, and one which need not be decided now. But certainly, such knowledge could not qualify him to give an opinion of the value of the services in gross for a season. That was, substantially, passing upon the amount of the plaintiff's claim, and not stating facts. It was in effect swearing to

Harris v. Roof's Executors.

the amount of damages generally, which is inadmissible. (*Paige* v. *Kelly*, 5 *Hill*, 603. *Harger* v. *Edmonds*, 4 *Barb*. 256. *Giles* v. *O'Toole*, *Id*. 261. *Dolittle* v. *Eddy*, 7 *Id*. 74.) The defendant's counsel stated his objection in a way impliedly admitting that the witness might give his opinion of the value of those particular services, of which he had personal knowledge. Farther than that, certainly, the witness could not go; and it is evident that this testimony had great influence upon the mind of the referee.

But there is another conclusive objection to the allowance of the sum of $600 for services at Albany. If the plaintiff, like Matchin, was to have a share of what might be obtained by the application, as positively testified by one witness, the agreement was illegal. Champerty is not confined to courts of common law. (*Wallis* v. *Duke of Portland*, 3 *Ves*. 494. *Stevens* v. *Bagwell*, 15 *Id*. 156, *n*.) And even without such agreement, I think the claim invalid, as against public policy, and prejudicial to sound legislation. In this case, it appears that the claimant against the state was an old man; for as I understand the evidence the plaintiff married his granddaughter; and sought compensation for a pretended interest in lands, granted at least nearly a century since, if not much earlier. But admitting the claim was put forth in good faith, there seems to be no proof of performance of any service by the plaintiff during these three sessions of the legislature, except to procure certain papers to be looked up and referred to a committee; a work in which, unless a member or an officer of the house, he could not very properly aid; and appear before such committee, and also talk with the members and the attorney general. Matchin says that in 1846, " under Harris' charge, the matter was referred to a committee," and in 1847, the plaintiff " went to see members, to get them to aid in voting for the claim," and he saw him conversing with them at seven of the principal hotels in Albany; and he believes a report was got up by Mr. Harris' means." Every citizen has a right to petition the legislature, and accompany the petition with all necessary documents. And he may employ any person to prepare them. But all petitions go to a committee

through the house. (*Jeff. Man.* § 11.) And counsel too, can be heard on private bills, with leave of the house. But it is the duty of every legislative body, and every member of it, to give all proper and necessary attention to the business before it. It is to be intended that "the legislature always have truth and justice before their eyes." (*Plowd.* 398.) And it certainly would imply a most unjustifiable dereliction of duty to hold that the employment of individuals to visit and importune the members, is necessary to obtain justice. Such practices would have a tendency to prevent free, honorable and correct deliberation and action of this most important branch of sovereignty. Very few cases similar to this, or bearing any analogy thereto, are to be found in our law books ; and it is to be hoped ever will be, for the best of reasons. In England, in some election cases, in which, under their very exceptionable system, the expenses are enormous, it has been held that the candidate, alone, was liable. (*Wallis* v. *Portland,* 3 *Ves.* 494, *and cases there cited.*) And in some railway cases there, principles have been advanced, which I should regret to see obtain in this country. (*Simpson* v. *Lord Howden,* 3 *Mylne & Cr.* 99 ; *S. C.* 9 *Cl. & Fin.* 61 ; *S. C.* 5 *Rail. & Can. Ca. Howden* v. *Simpson,* 10 *Ad. & El.* 793. *The Vauxhall Br. Co.* v. *E. of Spencer, Jac.* 64. *Chit. on Cont.* 583.) However the reasoning of the court of king's bench, of the vice chancellor, and master of the rolls, in these same cases, is highly commendable. (*Howden* v. *Simpson,* 10 *Ad. & El.* 793. *Simpson* v. *Howden,* 1 *Keen,* 583. *Vauxhall Br. Co.* v. *E. of Spencer,* 2 *Madd.* 356.) In this country we have had a few analogous cases. A contract, founded on an agreement to obtain signatures for a pardon, (*Hartzfield* v. *Gurden,* 7 *Watts.* 152 ;) or to procure the passage of an act by the legislature, by using personal influence, &c., (*Chippenger* v. *Hopbaguh,* 5 *Watts & Serg.* 315 ;) an agreement to pay a sum for withdrawing opposition to the passage of an act touching the interests of a corporation, (*Pingry* v. *Washborne,* 1 *Aik.* 264 ;) were held void. (*And see Platt on Cov.* 570 ; *Chit. on Cont.* 220, 583 ; *Gulick* v. *Ward et al.* 5 *Halst.* 87 ; *Swayze* v. *Hull,* 3 *Id.* 54 ; *Coppock* v. *Brown,* 4 *Mees. & W.* 361 ; *Stan-*

Harris *v.* Roof's Executors.

*ly* v. *Jones,* 7 *Bing.* 369.) I can not think it good public policy to require our courts to enforce such contracts. It can neither be necessary nor proper for the legislature to be surrounded by swarms of hired retainers of the claimants upon public bounty or justice. To legalize such a system, would, to say the least, be a reflection upon the ability and industry of our legislators.

But suppose the plaintiff entitled to recover on a *quantum meruit,* what is to be the measure of compensation? There was no proof showing that counsel were heard, or even that the plaintiff pretended to act as counsel. Counsel could not appear without leave of the house, or a committee. If leave had been granted and the plaintiff had acted as counsel for the testator, a question would have arisen, whether the rule in this state, allowing counsellors at law to sue for their services, would apply. (*Stevens* v. *Adams,* 23 *Wend.* 57. *Adams* v. *Stevens,* 26 *Id.* 451.) At common law, barristers could not sue for their services, even in a court of law. It does not appear that the plaintiff was a professional man, or pretended to be an advocate. What then could he do to entitle him to such compensation? The remuneration of an agent or employee, is not necessarily graduated by the benefit derived from his services. But admitting there was a general retainer in the matter, and that the plaintiff is entitled to recover on a *quantum meruit,* that does not authorize him to expend money and time uselessly; certainly not unless requested to do so. And here, as we have seen, there was very little, if any thing, that he could do; and it is very clear that he did very little.

I think there was error in the admission of evidence; and that the principal charges allowed by the referee were not the foundation of an action, both on account of the nature and extent of the services.

Report set aside.