## Rose and Hawley *vs.* Truax.

An agreement in respect to lobby services, and in effect providing for the sale of an individual's personal influence to procure the passage of a private law, by the legislature, is void, as being inconsistent with public policy, and will not support an action.

If a contract be an entire one, and it be void in part, it is void *in toto.*

If any part of an indivisible promise, or any part of an indivisible consideration for a promise, is illegal, the whole is void, and no action can be maintained on it.

Where a contract or transaction is held to be illegal and void and consequently not enforceable, such contract or transaction cannot be sifted and the legal services rendered under it, or in its pursuit, separated from the illegal service, and a recovery had for so much of the service as shall be adjudged to be legal.

Where an entire agreement contains an element which is legal and one which is void, as being against public policy, the legal consideration cannot be separated from that which is illegal and void, so as to found an action on the legal consideration.

Courts of justice are not required, in any way, to aid the enforcement of an illegal contract, or to lend their assistance, in any respect, to an illegal transaction.

The parties, being *in pari delicto,* the courts will leave them where they find them, and not attempt to balance equities.

Their action is controlled by a principle having no respect to the equities between the parties, or their bad faith towards each other, but rests upon the solid and broad foundation of a wise and prudent governmental policy.

APPEAL from a judgment entered on the report of a referee. The plaintiffs, as assignees of one Absalom Gregg, brought an action to recover from the defendant, a settler on the Oneida purchase of 1840 and 1841, the sum of $263 and interest, being ten per cent, as was alleged, upon the sum of money canceled by the state from the amount of indebtedness existing on the defendant's bond, and which he had agreed, with other settlers, to pay to Gregg, in the event of Gregg procuring the passage of a law granting relief to them.

In 1840 and 1841, the state having acquired by treaty with the Oneida indians, a large tract of land, sold the same in separate parcels, of about 100 acres each, to the highest bidder, under the direction of the surveyor general. For various reasons, as late as 1849, their lands had not been paid for in full by the purchasers. They had gone into possession, paying one quarter of the purchase money, and bidding for the lands much more

than they were worth; so that in 1849, the indebtedness of
many of the settlers on the tract equalled the value of the land
itself with the improvements put upon it. In the early part of
the month of January, 1849, some fifty of these settlers, among
whom was the defendant, addressed a petition to the legislature,
setting forth their embarrassments, and asking that they should
be relieved by the passage of a law permitting them to surren-
der the certificates of purchase which they held on the sale made
by the surveyor general and relinquish their lands to the state,
and to be absolved from all further liability on their bonds ; and
that they might be permitted to hold said lands and receive title
therefor, on payment to the state of the value as appraised by the
appraisers appointed under a law of 1845, with interest thereon,
deducting therefrom whatever the petitioners had theretofore
paid for said lands into the treasury of the state, and receive
new certificates upon such basis. On the 9th of January, 1849,
the settlers, of whom the defendant was one, entered into a con-
tract in writing, in substance as follows : " Whereas the under-
signed have petitioned the legislature of the state of New York
for relief upon certain purchases of land from the state of New
York, and to that end seek to have a new certificate issued to
the undersigned by said state, upon a different basis from that
on which their certificates now rest; and whereas the said Gregg
has been by us selected and appointed *to use his influence, ef-
forts and labor in procuring the passage of a law by the said
legislature, having for its object relief to the undersigned ;*
now therefore we the undersigned, for and in consideration that
the said Gregg will, at the present or next session of the legis-
lature, procure the passage of such law ; and in further con-
sideration of the sum of one dollar to each of us in hand paid,
we do jointly and severally promise and agree with said Gregg,
to pay to said Gregg the sum of ten per cent upon the amount
of money or sum which shall be canceled from the amount of in-
debtedness now existing upon the land of the undersigned, and
to be embraced in such law ; at the date hereof the sum of $25
is paid said Gregg, by the undersigned, which in the event of
the passage of the said law, is to be ratably credited towards the

Rose *v.* Truax.

payment of such ten per cent to the undersigned. In case said Gregg shall fail to secure the passage of said law, then the undersigned are absolved from all liability for the services of the said Gregg."

On the agreement was indorsed the following : " The true intent, meaning and construction of the above agreement being that each of the above named persons shall only be liable for the ten per cent specified upon the specific relief obtained by each person, and not any other or greater liability on the part of each person than the ten per cent due from him individually.

ABSALOM GREGG."

Upon the execution of this contract Gregg went to Albany, and succeeded in having a bill introduced into the assembly, which subsequently passed that body. This bill only proposed to give relief to sixteen of the settlers, in which the defendant was not included, and was in no respect what had been petitioned for. It did not pass the senate, and therefore failed to become a law. On the first of January, 1850, the settlers had another meeting, and a new petition to the legislature was drawn up. Dexter Hubbard and Oliver P. Root (two of the settlers) who subsequently claimed to have rendered services in procuring the passage of an act in 1850, on the retainer of Gregg, were present at this meeting. The proof was quite clear that Hubbard agreed to go to Albany and lobby, upon having his expenses borne, and Root agreed to go without charge. They had both large personal interests in the matter. A subscription was circulated among, and signed by, the settlers, to pay Hubbard's expenses. Hubbard circulated this petition, took it to Albany, and had it presented in the assembly. At Albany, Gregg, Hubbard, Root and James R. Rose, then a clerk of the assembly, set about procuring the passage of a law to relieve all the settlers ; Hubbard, Root and Rose, on the retainer of Gregg, and under his contract if they are to be believed; whilst the settlers had reason to suppose that Hubbard and Root were acting under the understanding of January, 1850, as they both represented that they were not acting under the ten per cent contract. They lobbied the legislature and committees from place

to place, and the members in their rooms. They employed others to importune the members. They appeared before the committees of the assembly and senate in regard to the bill. Rose made a brief to be used before the assembly committee, and subsequently drew the report and bill. After the bill had passed the assembly, they repeatedly called upon the senate committee. This committee was at first adverse to the claim, and had resolved to report against them ; but, persevering, they succeeded, in the end, in getting a report in their favor, and finally on the 6th of April, 1850, the bill passed and became a law.

The first section of this act authorized the comptroller to receive back the certificates then held by the settlers and to cancel and deliver up the bonds given to the state by said persons, on their complying with the provisions of the third section of the act. The second section directed the commissioners of the land office to make inquiry into the pecuniary circumstances and responsibility of each of the purchasers and present owners of the several lots and parts of lots, and cause to be made an appraisal of the several lots or parts of lots, in which appraisal the said several lands should be appraised at the present value of the same, exclusive of the improvements made thereon. The third section provided, that on surrendering the certificates as mentioned in the first section, the commissioners of the land office should, in all cases in which it should appear to them from the inquiry provided for in the preceding section, that the purchasers and present owners were of doubtful, or of no pecuniary responsibility, sell to the persons interested, or to those holding under them, the lands so bought by them at any of the sales aforesaid, at a price equal to the present value of the same, exclusive of the improvements made thereon since said sale, and after deducting from the value of said improvements a reasonable rent or allowance for the use and occupation of the premises, should deduct therefrom the payments made for principal of the purchase money, and compute interest on the balance for such time as the interest had not already been paid, and should issue new certificates to the holders, and take their bonds for the amount of such balance and interest in the usual manner, payable at the

usual time and times, and with the like condition of bonds in such cases.

After the passage of the act, appraisers were appointed, who proceeded to the reservation, and were some four or five weeks examining into the matter and making their report. Afterwards Hubbard, Root and Rose attended upon the commissioners of the land office, and the clerks in the comptroller's office occasionally during the summer; and finally, on the 1st of November, 1850, the computations were made and new certificates issued. At this time there were sixty-three settlers on the reservation, and the aggregate amount of their indebtedness to the state was some $79,000, which was compounded for some $20,000; deducting an amount nearly equal to $59,000, and making the per centage to Gregg on the amount deducted, $5829.98. Gregg seems to have had nothing to do with the matter, personally, after the bill passed the legislature.

Gregg had an interest to be relieved to the extent of $1551.-50. The amount deducted from his indebtedness was $989.36. Dexter Hubbard's indebtedness was $3360.95, from which was deducted $2466.76. Root's indebtedness was $1928.31, from which was deducted $1899.47. The defendant's indebtedness was $3166.74, from which was deducted $2638.68. In January, 1850, and about the time the second petition was presented to the legislature, Hubbard agreed with Gregg that he was to assist him to procure the passage of the bill, and as a consideration therefor was to have three-tenths of the ten per cent, promised to Gregg. Root and Rose were also employed by Gregg. On the 10th January, 1851, Gregg assigned to James R. Rose and Dexter Hubbard all the money due or to become due to him by virtue of the contract of the 9th of January, 1849. On the 23d April, 1851, Hubbard and Root assigned to James R. Rose and Elias Y. Hawley, the plaintiffs in this suit, "All, our and each of our rights, interests, claims, demands, choses in actions and accounts against the persons whose names are subscribed to the agreement in writing to Absalom Gregg hereto annexed, and each and every of them, whether arising upon, or in any way connected with said agreement, or other-

wise existing against them in our favor, or in favor of either of us, alone, or in connection with said Gregg, or any other person or persons, with full power and authority to collect and compromise said claims as they may see fit." In the early part of 1852, the plaintiffs brought this action. The complaint sets forth the contract with Gregg of the 9th January, 1849; it then avers that Gregg, in pursuance of said agreement, attended the legislature in session at Albany at the date of the agreement, and also the session of the next legislature, during the following winter and spring of 1850, and not only used his own influence, efforts and labor, but obtained and secured the efforts, labor and services of others, his counsellors, agents and servants, in behalf of said defendant, and by means thereof did procure during the said session of the legislature of 1850, the passage of such a law as was contemplated by said agreement, having for its object relief to said defendant and others, purchasers therein mentioned; and in so doing Gregg paid, laid out and expended in behalf of said defendant, and at his request, large sums of money for his own personal expenses and disbursements and otherwise, in and about the business of the said defendant, and at his request. That under and in pursuance of said law a new certificate was, after the passage thereof, and before the commencement of this suit, issued to the said defendant by the state of New York, bearing date on, to wit, the 1st November, 1850, upon a different basis from that upon which his certificate rested at the time said agreement was entered into, and said defendant's former certificate was surrendered by said defendant and canceled by the state, and at the time of the issue of said new certificate the sum of $2638.66 was canceled from the amount of indebtedness existing upon the lands of the said defendant, due the state of New York, which was canceled in pursuance of said law, and said defendant by reason of the premises before stated became and was indebted and liable to pay to said Absalom Gregg the sum of $263.66, and which he the said defendant, after the passage of the act, promised in consideration of the premises to pay said Absalom Gregg. The complaint further avers that on the 10th January, 1851,

Rose *v.* Truax.

the defendant was indebted to Gregg in the further 'sum of $150 for work, labor and services performed by Gregg, his agents and servants, in and about the business of the defendant, and for money paid, laid out and expended by Gregg for the defendant. That the defendant was on that day also indebted to Dexter Hubbard, Oliver P. Root and James R. Rose, in the further sum of $150 for the work, labor and services of said Hubbard, Root and Rose, and each of them, their agents and servants, and the agents and servants of each of them jointly and severally in and about the business of the defendant, and for the defendant, and on his account, and at his request, and for money paid, laid out and expended by said Hubbard, Root and Rose, jointly and severally, and for board and lodging found and provided by them jointly and severally, for the defendant, on his account and at his request. That the several claims mentioned have since the 10th January, 1851, been sold and assigned to the plaintiffs jointly, and who are now the *bona fide* owners and holders of the claims, and the real parties in interest.

The action was referred to Amos Dean, Esq. as referee. On the hearing numerous exceptions were taken by the defendant to the admission and rejection of evidence. In May, 1853, the referee made his report, by which he found as a conclusion of law, that the defendant was indebted to the plaintiffs in the sum of $263.86. He also found as matters of fact, "that on or about the 9th January, 1849, the defendant retained and employed for the then present session of the legislature of this state, and if necessary for the next ensuing session, one Absalom Gregg, to render for him services in obtaining for him relief under a purchase formerly made by him from the state of certain lands in Oneida reservation; which retainer and employment had never been legally recalled, annulled or otherwise terminated, except by the obtaining of the relief sought; that services were rendered by said Gregg under and in pursuance of said retainer and employment; that Dexter Hubbard, Oliver P. Root and James R. Rose, each rendered services in the legislature of 1849 or 1850, one or both, and principally in the latter, which were legal, were designed to, and did, have the effect to procure relief; that Root was re-

Rose *v.* Truax.

tained by the defendant and employed by him to render service during the session of the legislature of 1850, and was also subsequently retained and employed by him to render services before the appraisers and commissioners of the land office ; that Hubbard was employed by Gregg, and rendered services under such retainer and employment, and that the rendition of said services was well known to the defendant, who approved of the same ; that Rose was retained and employed by Gregg, Hubbard and Root, and rendered services under such retainer and employment, both during the legislative session of 1850 and afterwards before the commissioners of the land office ; that such retainer or employment, or the services rendered in pursuance thereof, were known to the defendant, who approved of the same and was ready and willing to avail himself of all the benefits and advantages which were derived from all the services thus rendered, as well those rendered by the said Rose, as by the said Gregg, Hubbard and Root." The referee in his opinion accompanying his report, arrived at the conclusion that the contract sued upon was illegal and void, but reposing himself, as he says, "more on the broad features of the case, than upon any particular statement by any particular witness ;" he thinks it evident from the whole case that there was a retainer and employment of Gregg, which was never revoked or withdrawn, and that there was also a retainer and employment of Hubbard, Root and Rose ; that all these rendered *legal* services, which were effectual, and resulted in complete success ; that the defendant enjoys the fruits of them, and he knows of no good reason why the defendant should not be held to pay for them. In regard to the amount, he does not think the principle of ten per cent on the amount of relief obtained, to be severe or out of the way. The report was for $263.86.

*J. H. Reynolds*, for the plaintiff.

*T. Jenkins*, for the defendant.

*By the Court*, WRIGHT, J. Whatever may be the rights of the parties to this controversy, or however ungracious and in-

Rose *v.* Truax.

equitable the conduct of the defendant in resisting the claim of the plaintiffs, one thing is very manifest, that all were parties in concocting and consummating a scheme which resulted, if not in plundering the state of some sixty thousand dollars, at least in inducing the bestowal of that sum on her debtors, as a mere gratuity. The state was the victim; the public treasury depleted; and this action grows out of a controversy between the victors and the instruments used by them in effecting the end. The state, in 1840 and 1841, sold in separate parcels of about 100 acres each, under the direction of the surveyor general, a large tract of land lying in the counties of Oneida and Madison, which had been acquired by treaty with the Oneida indians. On these sales one quarter of the purchase money was required to be paid down, and the residue to be secured by bond of the purchaser with six per cent interest to the state; the purchaser receiving the certificate of the surveyor general showing such sale, which entitled the holder of such certificate to letters patent when the whole purchase price was paid into the state treasury. In 1849 and 1850, the purchasers or settlers of the several parcels of land were indebted to the state, in the aggregate, over the sum of seventy-eight thousand dollars. In January, 1849, they set on foot a scheme to rid themselves of a portion of this indebtedness without actual payment into the state treasury, whilst they retained their lands and the improvements made on them. The legislature were to be asked to permit them to surrender their old certificates of purchase, absolve them from further liability on the bonds given at the original sale, and permit them to hold the lands and receive title therefor on payment to the state of the value as ascertained by a new appraisal, deducting therefrom whatever the petitioners had before paid into the treasury of the state. A petition to this effect was got up and signed by the purchasers or settlers, and on the same day fifty-nine of them entered into an agreement in writing with one Absalom Gregg, (who himself was largely interested in procuring the relief,) that in consideration of Gregg using his influence, efforts and labor in procuring the passage

of a law by the legislature, having for its object the relief asked for to the settlers in their petition, and in case of his procuring the passage of the law at the present or next session of the legislature, they jointly and severally promised and agreed to pay to him the sum of ten per cent upon the amount of money or sum which should be canceled from their existing indebtedness, and to be embraced in such law. At the date of the agreement they advanced and paid to Gregg the sum of twenty-five dollars; and the agreement further provided that in the event of the passage of the law that sum was to be ratably credited towards the payment of the ten per cent. In case Gregg failed to secure the passage of the law, the settlers were to be absolved from all liability for his services.

In pursuance of, and with the view of carrying out this contract, Gregg attended at the session of the legislature in 1849. He succeeded in procuring a bill to pass the assembly giving relief to some sixteen of the settlers; but it failed to pass the senate and become a law. In January, 1850, at a meeting of the settlers, another petition was got up and forwarded to the legislature by the hand of one Dexter Hubbard, (who was largely interested in the relief and who engaged to attend at Albany, on the payment of his expenses.) As Gregg's contract, however, extended to the sessions of 1849 and 1850, he was not disposed, in 1850, to release the obligations of the settlers under it without a further trial. Hubbard entered into an arrangement to aid him upon the condition of receiving three-tenths of the ten per cent in case of success, whilst he was at the same time drawing money from the settlers to meet his expenses. Oliver P. Root, (another person largely interested in the relief,) and who had promised in 1850, to attend the legislature in behalf of the settlers without compensation, also joined and acted with Gregg. They secured the services of one Rose, then the clerk of the assembly. After importuning the members, following them to their rooms, appearing before the committees of the assembly and senate in public and in private, drawing up the report and bill for the assembly committee, pertinaciously urging and inducing the senate committee to report in favor of the bill, after they had

Rose *v.* Truax.

determined, and so announced, to report against it; they finally procured a law to be passed, directing the comptroller to receive back the old certificates of purchase, and cancel and deliver up the old bonds given to the state, providing that the commissioners of the land office should cause an inquiry to be made into the pecuniary circumstances of each of the several owners of lots and parts of lots in the purchase, and a re-appraisal of the lots at their present value, exclusive of the improvements made thereon since the original sale, and also providing that on the surrender of the original certificates, the commissioners of the land office should in all cases, in which it should appear to them from the inquiry provided for in the act, that the purchasers and present owners were of doubtful or no responsibility, sell to the persons interested or to those holding under them, the lands so bought by them at the original or any previous sale, at a price equal to the present value of the same, exclusive of the improvements made thereon since the original sale ; and after deducting from the value of the improvements a reasonable rent or allowance for the use and occupation of the premises, should deduct therefrom the payments made for principal of the purchase money, and compute interest on the balance for such time as the interest had not already been paid, and issue new certificates to the holders, and take their bonds for the amount of such balance and interest. But something further was to be done before the law could be made available to the settlers. The commissioners of the land office were to institute an inquiry into the pecuniary responsibility of the holders of the lands, and to cause the lands to be appraised at their then value, deducting improvements. Hubbard, Root and Rose attended upon the commissioners of the land office, obtained the appointment of appraisers, attended upon the appraisers, and upon the computations of the clerks in the comptroller's office, and succeeded about the 1st November, 1850, in having the old certificates surrendered and old bonds canceled, and new ones issued ; and the aggregate indebtedness of the settlers, which was $78,890, reduced to $19,960. Through their efforts and influence with the legislature and the commissioners of the land office, the state

was the loser to the extent of $58,929; whilst Gregg was personally relieved to the extent of $989.36; Hubbard to the extent of $2,466.70, and Root $1899.47, or within thirty dollars of his entire indebtedness. Rose, as he had no pecuniary interest in the purchase, got nothing.

In January, 1851, Gregg assigned to Rose and Hubbard all the moneys due and to become due to him by virtue of the contract of the 9th January, 1849, and in April following, Hubbard and Root assigned to the plaintiffs in this suit all their claims or demands against the settlers who entered into the agreement with Gregg, whether arising upon or in any way connected with the agreement or otherwise existing against them. The defendant, who was one of the persons that executed the contract with Gregg, and whose indebtedness to the state was canceled to the amount of $2638.68, refused to pay the ten per cent as provided for by the agreement, and the plaintiffs, as assignees of Gregg, and also of Hubbard and Root, brought their action to enforce such contract and recover the sum stipulated to be paid thereby. In their complaint they counted upon the contract, adding thereto a general *quantum meruit* for labor and services rendered alike by Gregg, Hubbard, Root and Rose, at the request of the defendant.

The principal and perhaps the sole inquiry in the case relates to the validity of the contract sought to be enforced. The defendant may have availed himself of the services of Gregg, and those employed under the latter, to reap a benefit, and in one point of view, as it respects Gregg and his assignees, it may be ungracious and inequitable to resist the claim; yet if the contract contravene public policy, offending public morality and decency and for that reason is illegal and void, this court should not lend its aid to enforce it, or assist the illegal transaction in any respect. Courts of justice will leave the parties to a contract or transaction prohibited by the common law or statute, in the condition in which they find them, yielding no assistance to either party in enforcing the illegal compact. The contract in this case is one on its face stipulating for *lobby* services; or, in effect, the sale of the personal *influence*, efforts and labor of

Rose *v.* Truax.

Gregg to procure the enactment of a private statute, having for its object the relief of the purchasers on the Oneida reservation. It is this, in legal effect: a large number of debtors to the state, being desirous of relief, combined together in an appeal to the legislative bounty. So far, perhaps, it was legal and proper to go. It was their right to petition the legislature, leaving the bestowal of the public bounty to their untrammeled action. It may be also, that they had the right to enforce their claims upon the justice and bounty of the state, by appearing openly in person or by counsel before the proper legislative committees, to urge such claims; though this, to say the least, is a reflection upon the ability and industry of our legislators.· But they went further. Gregg was especially appointed and selected by them, not to proceed to the legislature with their petition, and cause it to be presented, and as their counsel openly and fairly urge the justice of their claims before the proper committees, but to use his personal influence, efforts and labor to procure the passage of the law; and in the event of success he was to be rewarded with the largest share of the extorted bounty. This was substantially a contract for *lobby* services, of every kind and description necessary to accomplish the end; and Gregg so understood and acted upon it. The settlers contracted for the exercise of his personal *influence* with the legislature to procure the law; and success attending such exercise, he was to have his reward; otherwise not. He was to accomplish his mission, viz. the procuring of the law by his "influence, efforts and labor," or, failing therein, to receive nothing for their exercise. What is this but a contract to procure the enactment of a private statute? What else but an agreement in respect to lobby services, and in effect providing for the sale of the personal influence of Gregg to procure the passage of a private law? And being so, it is void as inconsistent with public policy. Our government is founded theoretically upon the most pure and exalted public virtue. Public policy demands that her legislators and executive officers shall discharge the important trusts and duties committed to them independently, uninfluenced by any illegitimate or sinister agencies. It is against the genius and policy of our govern-

Rose v. Truax.

ment that her legislature and executive officers shall be surrounded by swarms of hired retainers of the claimants upon public bounty or justice. The nuisance has become almost intolerable; and all that is required to make it quite so, is for courts to tolerate contracts in respect to the services of these retainers, and, by action, enforce claims for their services. This case presents a vivid picture, from beginning to end, of the mischiefs to sound legislation and enlightened and independent action of public officers, growing out of the busy and corrupt interference of those who haunt the sessions of the legislature, and the halls of the executive departments of the government. The whole affair, in essence and effect, was against the soundest principles of public policy, as it tended to withhold from the legislative and public officers the knowledge of facts, necessary for an adequate performance of their public duties, and supplied their place with misrepresentations, importunity and artifice. I am not disposed to tolerate or enforce a contract, or even a transaction of the kind counted on. It is void, and should be so held as manifestly against public policy. The doctrine is settled by the courts that contracts in respect to lobby services are void, and also all like contracts. (*Clippenger* v. *Hepbaugh*, 5 *Watts & Serg.* 315. *Fuller* v. *Danne*, 18 *Pick.* 472. *Harris* v. *Roof's Ex'r*, 10 *Barb.* 489. *Tilson's Trustees* v. *Himes*, 5 *Penn. R.* 452. 1 *Verm. R.* 264. *Gray* v. *Hook*, 4 *Comst.* 449.) In *Clippenger* v. *Hepbaugh*, (5 *Watts & Serg.* 315,) the doctrine was asserted and maintained, that where the tendency of a contract is contrary to sound morality and public policy, leading necessarily in the hands of designing and corrupt men to improper tampering with members, and the use of an extraneous secret influence over an important branch of the government, it is not enforceable, and the court declared void a contract to procure the enactment of a private statute. In *Harris* v. *Roof's Ex'rs*, (10 *Barb.* 489,) it was held that no action would lie for services as a lobby agent, in attending to a claim before the legislature; agreements in respect to such services being against public policy and prejudicial to sound legislation. "I cannot think," says Hand, J., in the latter case, "it good

Rose *v.* Truax.

public policy to require our courts to enforce such contracts. It can neither·be necessary or proper for the legislature to be surrounded by swarms of hired retainers of the claimants upon the public bounty or justice;" and the court set aside the report of a referee, for the reason that no action could be founded upon the principal charges allowed, which were for services and expenses in attending upon the legislature to urge a claim of the defendant's testator. But were we without authority or precedent, the contract in this case manifestly contravening sound morality and public policy, on reason and principle we should not hesitate to declare it illegal and void; saying to the parties that a court of justice shall not be successfully invoked to aid or assist the transaction in any respect.

The referee had no difficulty in. holding void the contract upon which the action was based; yet he reported in favor of the plaintiffs for an amount equal to the ten per cent stipulated to be paid by the void contract. He says: "I repose myself more upon the broad features of the case than I do upon any particular statement made by any particular witness. I think it evident from the whole· case, that there was a retainer and employment of Gregg, which was never revoked or withdrawn, and that there was also a retainer and employment of Hubbard, Root and Rose; that all three rendered legal services, which were effectual and resulted in complete success; that the defendant enjoys the full benefit of them, and I know of no good reason why he should not be held to pay for them." And these facts he finds to have been satisfactorily proved. This reasoning seems most extraordinary. It is in substance this: you, Gregg, contracted and was retained to do an illegal service, and you called in to your aid, with the knowledge of the defendant, Hubbard, Root and Rose, and finally succeeded in accomplishing the end from which the defendant has reaped a benefit. The service which you contracted to perform, or was retained to do, contravened public policy, and hence the contract was illegal, and no recovery could be had for the rendition of the services. The contract was an entire one, and though under it Gregg and·his compeers may have performed some services that

were legal, yet he cannot recover for them, as the consideration being indivisible, the whole contract is void, and no action can be based upon it. But as the proof shows that in acting under the contract, or upon a retainer of the defendant, they rendered legal services which, with the illegal, were effectual, and result-ed in complete success, the full benefit of which the defendant is enjoying, he should pay Gregg for the services which he could be legally retained to perform. As a model of legal reasoning, I confess that this is to me incomprehensible. If the contract be an entire one and it be void in part, it is void *in toto*. If any part of an indivisible promise, or any part of an indivisible consideration for a promise, is illegal, the whole is void, and no action can be maintained on it. Holding the written contract with Gregg to be void, there could be no re-covery under it, even for services that Gregg, and those whom he employed, might legally have performed. An illegal ele-ment being incorporated in an instrument in which the bargain is one, the consideration one, and the covenant one, the whole is vitiated. That was so with Gregg's contract, and effectually disposed of that branch of the plaintiff's case. So, also, all contracts growing out of or connected with any illegal or im-moral contract or transaction are void. If the contract be in part only connected with an illegal transaction, and grows im-mediately out of it, though it be in fact a new contract, it is equally tainted by the illegality of the transaction from which it sprung. (4 *Wash. C. C. R.* 297. 11 *Wheaton*, 258. 4 *Comst.* 449.) The test, says Mr. Chitty, whether a demand connected with an illegal transaction is capable of being en-forced at law, is, whether the plaintiff requires any aid from the illegal transaction to establish his case. (*Chit. on Con.* 657, *and cases cited.*) If there was any such retainer, there-fore, as the referee supposes, in this case, it was not less void than the written contract between Gregg and the settlers. All the services rendered by Gregg, Hubbard, Root and Rose, were either under Gregg's written contract or growing out of or in furtherance of the illegal transaction contemplated by such contract. They were connected with and were a part of

Rose *v.* Truax.

the plan and means used to carry an act through the legislature in conformity to that which Gregg had let out his personal influence and efforts to procure. Whether Hubbard, Root and Rose were employed by Gregg, or rendered services on the direct retainer of the settlers, towards the accomplishment of the illegal end in view, (as the referee finds, I think in opposition to the proof,) can make no difference. In either view we come back to the questions whether a recovery can be had for lobby services rendered in pursuance either of a written or a parol agreement; and whether the court finding a transaction to exist tainted with immorality and corruption, and hence illegal, shall so far countenance and uphold the corrupt thing, as to undertake to sift from it some slight service unexceptionable and meritorious in itself, but tainted by its connection; and for the reason that the actors were successful by the use of means legal and illegal, uphold and sustain a claim for those services that they might legally perform, upon the ground that the defendant has availed himself of and reaped benefits, the fruits of the mixed service.

This is what the referee undertook to do. Gregg held his written contract, claiming it as a valid and subsisting agreement down to the time of the trial. The referee finds that Gregg was retained by the settlers, and rendered legal services; yet there is no evidence in the case, of a retainer, other than that shown by the contract itself; and a branch of the defense was that the settlers, in January, 1850, had attempted to rid themselves of the services of Gregg, which the referee held that they did not accomplish, as his contract covered the sessions of 1849 and 1850. The plaintiffs sued upon Gregg's contract, produced and proved it, and claimed the right to recover under it. Not only Gregg, but Hubbard and Root claimed to act under it, and insisted on their compensation, pursuant to its provisions. Rose was employed by Gregg, under that contract. In acting under the contract they may have performed some slight service of a legal character, such as presenting the petition to the legislature, appearing openly to urge the claim before the appropriate legislative committees; and after

Rose *v.* Truax.

the law passed, as it was somewhat obscure in its phraseology; and they had drawn it up themselves, perhaps, appearing before the commissioners of the land office to explain it; but beyond these they did nothing of a legal or meritorious nature; nothing that can be characterized as any thing more or less than lobbying the legislature, the commissioners of the land office and the appraisers. The referee held the contract under which they all claimed to have rendered the service for which the action is brought, illegal and void, and of course no recovery could be had under it. The law pronounced the transaction an illegal one, not because in carrying it out the actors might or might not do something prejudicial to sound legislation or official integrity, but because the thing itself, in its nature and essence, was contrary to good morals and sound public policy. When the referee properly held the contract to be void, and that no action could be maintained for services as *lobby agents*, he effectually disposed of the whole case. He could not, (finding a general *quantum meruit* count in the complaint, and which under the code was no valid statement of a distinct cause of action, nor intended to be,) sift out of the transaction what he chooses to term legal services, rendered in the pursuit of an illegal object, and intermixed with an illegal transaction brought to a successful issue by Gregg and his associates; and because the defendant was enjoying the fruits of such mixed service—the end and consummation of a thing forbidden by law—that he should be made to compensate the plaintiffs, at least, for those services that might be done in and about the legislature and the public offices, not inconsistent with sound policy. Neither, if this were proper, could the referee *guess* at the value of the services, and because the settlers had originally contracted to have the whole illegal job completed, upon paying ten per cent on the amount of relief obtained, fix the measure of compensation at a rate unjustified by the facts of the case. Upon the principle on which compensation was awarded by the referee, the plaintiffs would receive from all the settlers the sum of $5,829.98, for circulating and presenting their petition to the

Rose v. Truax.

legislature, appearing before the legislative committees to urge the law, (though none of them were attorneys except Rose,) and appearing before the commissioners of the land office to explain it.

Our conclusions are, that the contract under which the plaintiffs claimed to recover, was inconsistent with public policy, and consequently illegal and void, and no action could be maintained upon it; that the claim in this case was for services performed as *lobby agents*, under such contract, or upon a retainer or agreement growing out of or connected with the illegal contract or the illegal transaction contemplated by it; and hence, is equally illegal; and whether the services be performed in pursuance of a written or parol agreement, the demand cannot be enforced by action; that holding a contract or transaction illegal and void, and consequently not enforceable, such contract or transaction cannot be sifted, the legal services rendered under it, or in its pursuit, separated from the illegal service, and a recovery had for so much of the service as shall be adjudged to be legal; that where an entire agreement contains an element which is legal and one which is void, being against public policy, the legal consideration cannot be separated from that which is illegal and void, so as to found an action on the legal consideration; that the action in this case was upon Gregg's contract alone, and no other separate and distinct cause of action was stated in the complaint, and that holding that contract void the action failed altogether. But if this were otherwise, and there is proof in the case of a direct and independent retainer and employment of Rose, Hubbard and Root by the defendant, there is none of Gregg, and such retainer or employment was not to perform services only legal in their character, but to facilitate a transaction in its nature and essence void. That upon the assumption that Hubbard, Root and Rose performed services before the commissioners of the land office and the appraisers, that were unconnected with any illegal contract or transaction, a claim for them might be enforced; yet being mixed up with lobby services before those officers, they must share the same fate with services under the

Gregg contract. The services were part and parcel of those stipulated for by the illegal contract or rendered in furtherance of the illegal transaction, viz: the lobbying through all the forms of legislation, and before the state officers, of a private statute giving relief to the settlers. As I have remarked, courts of justice are not required, in any way, to aid the enforcement of an illegal contract, or lend their assistance in any respect to an illegal transaction. The parties being *in pari delicto*, the courts will leave them where they find them, and not attempt, as the intelligent referee did in this case, to balance equities. Their action is controlled by a principle having no respect to the equities between the parties, or their bad faith towards each other, but rests upon the solid and broad foundation of a wise and prudential governmental policy.

On the hearing before the referee, numerous exceptions were taken by the defendant's counsel as to the admission and rejection of evidence, (two or three of which were apparently well taken,) but as the judgment must be reversed upon the legal grounds above stated, I have not deemed it necessary to critically examine them.

The judgment entered on the report of the referee must be *reversed*, and a new trial ordered, with costs to abide the event.

[ALBANY GENERAL TERM, May 7, 1855. *Parker, Wright* and *Watson,* Justices.]