HORATIO HOULTON v. CHARLES H. DUNN.[1]

January 17, 1895.

No. 8979.

**Agreement to Procure Legislation—Public Policy.**

The plaintiff agreed with defendant to locate him upon a valuable quarter section of pine land, which had long been withdrawn from market for railroad purposes, and to instruct him as to what he should do as such settler, and do all that was necessary or could be done to bring the land into the market, and enable defendant to acquire title thereto under the homestead or pre-emption laws of the United States. In pursuance and performance of this agreement, the plaintiff attended several sessions of congress, and appeared before the secretary of the interior and the committees of the senate and house of representatives, and employed counsel, to urge the passage of a bill declaring said lands forfeited to the government, and providing that parties who had settled on the land in good faith should have the preference to enter the same under the homestead laws, when the same should be restored to the market. For such services the defendant agreed to pay plaintiff when he (defendant) should acquire the right to make final proof for such land. *Held*, that the contract was void, as against public policy.

Appeal by plaintiff from an order of the district court for Sherburne county, Baxter, J., denying a motion to set aside an order for judgment for the defendant upon the pleadings and for a new trial. Affirmed.

[1] Reported in '61 N. W. 898.

*J. M. Gilman, C. D. O'Brien,* and *Robertson Howard,* for appellant.

A person may lawfully contract to do as agreed in this case. Powers v. Skinner, 34 Vt. 274; Barry v. Capen, 151 Mass. 99, 23 N. E. 735; Chesbrough v. Conover, 21 N. Y. Supp. 566; s. c., 140 N. Y. 382, 35 N. E. 633, 634; Beal v. Polhemus, 67 Mich. 130, 34 N. W. 532; Denison v. Crawford County, 48 Iowa, 211. The question is whether, when from the face of the contract it does not appear that improper means were to be used, a contract to procure legislation in itself proper, is absolutely void. If this contract was to use the personal influence of the plaintiff, directly or indirectly, with individual members of congress, it would be a "lobbying" contract and illegal; if it was a contract for appearance in person or by counsel before the proper authorities (e. g. commissioner of public lands) or the appropriate committees of the senate or house to advocate the passage of the law, it would be legal. Unless the agreement by its express terms involved an unlawful act or one against public policy, the court could not presume that the parties intended such an act. Moyer v. Cantieny, 41 Minn. 242, 42 N. W. 1060; Hunt v. Test, 8 Ala. 713, 720.

*Robb & Slack,* for respondent.

BUCK, J. The plaintiff claims to have acquired valuable information in regard to certain pine lands in Bayfield county, Wisconsin, and that the plaintiff and defendant entered into an agreement, by the terms of which the defendant was to enter into possession of 160 acres of such pine lands, belonging to the United States, not then in market, nor subject to entry, and to hold the same until it could be purchased from the government; and the plaintiff, for a consideration to be paid by the defendant, agreed to procure such legislation from congress as would enable the defendant to secure the land in preference to any other party. The plaintiff performed his part of the agreement and procured the promised legislation; and this action is brought by the plaintiff upon the agreement, to recover from the defendant the sum of $3,500, the amount claimed by the plaintiff to be the value due him for his services, as well as for certain expenditures made by him pursuant to said agreement. There was an answer by the defendant and reply thereto by the plaintiff, which we need not set out in detail. When the cause was called for trial at a general term of the district

court for Sherburne county, the defendant moved for judgment upon the pleadings, upon the ground that the complaint did not state facts sufficient to constitute a cause of action; and the motion was granted by the court upon the ground that the agreement was void, as against public policy.

The principal controversy is over that part of the plaintiff's complaint which is as follows, viz.: "And the plaintiff further shows to the court that, during the sessions of congress of 1887–88 and 1888–89 and 1889–90 and 1890–91, he attended at Washington from three to six months each year, and appeared before the secretary of the interior and appropriate committees of the senate and house of representatives, and employed counsel, for the purpose to urge the passage of a bill declaring said lands forfeited to the government, and also that parties who had in good faith settled upon said lands should have the preference right to enter the same from the government under the homestead laws, when the same should be restored to the market; that by an act of congress approved September 29, 1890, entitled 'An act to forfeit certain lands heretofore granted for the purpose of aiding in the construction of railroads and other purposes,' the lands hereinbefore described, together with other lands, became forfeited to the United States, and by section 2 of the act the defendant had the prior right, over any one else, to prove up and acquire title to the lands hereinbefore described, by reason of his being a settler thereon." It is then further alleged that defendant did make final proof, and acquired title to said land, and that at the time he settled upon the same, and when he acquired the right to make final proof therefor, the land was worth $12,000 to $15,000, and that the defendant sold the pine timber upon the land for $12,000. The business relations between these parties will be better understood by our quoting further from the allegations in the complaint, which we do, one of which is as follows, viz.: "That the said defendant was wholly unacquainted with said business, but desired to settle upon a valuable quarter section of said lands and acquire a title thereto under the homestead or pre-emption laws of the United States, when said lands should be restored to the market, and desired the plaintiff to locate him (the defendant) upon some such quarter section, and instruct him as to what he should do as such settler, and to take charge of

him, and do all that was necessary or could be done to bring the land into the market, and enable the said defendant to acquire the title thereto, and promised and agreed that he would do what was right with the plaintiff for such information and service, in the way of compensation therefor, when he (the defendant) should acquire the right to make final proof for such land."

The question here involved is a very important one, and we regret that we did not have the benefit of an oral argument by the very able counsel for the plaintiff. If there were services rendered and expenditures incurred by the plaintiff for the defendant, as he alleges, entirely disconnected with the services rendered in procuring congressional legislation, they would constitute a good cause of action; but, unfortunately for the plaintiff, he has included the value of the whole services and expenditures in one lump sum, and seemingly as though the contract was entire. Evidently the court below so treated the transaction; and from a perusal of the pleadings we do not see that it could have done otherwise. See Trist v. Child, 21 Wall. 441. The courts hold that there are two kinds of agreements relative to the matter of procuring legislation from our state and national legislatures and our municipal bodies, boards, or officers. One is the evil and mischievous agreement which tends to corrupt the lawmaking power, and is accomplished sometimes by subtle acts of personal importunity and intrigue, or by secret and insidious overtures, while at other times corrupt results are reached by startling boldness and daring. Some of the authorities which refuse to enforce this kind of agreements are as follows: Clippinger v. Hepbaugh, 5 Watts & S. 315; Harris v. Roof's Executors, 10 Barb. 489; Rose v. Truax, 21 Barb. 361; Mills v. Mills, 36 Barb. 474; Trist v. Child, 21 Wall. 441; Spalding v. Ewing, 149 Pa. St. 375, 24 Atl. 219; Oscanyan v. Arms Co., 103 U. S. 261, 274; Tool Co. v. Norris, 2 Wall. 45; Woodstock Iron Co. v. Richmond & D. Extension Co., 129 U. S. 643, 9 Sup. Ct. 402. In the case of Clippinger v. Hepbaugh, 5 Watts & S. 315, it was said by the court: "It matters not that nothing improper was done, or was expected to be done, by the plaintiff. It is enough that such is the tendency of the contract; that it is contrary to sound morality and public policy, leading necessarily, in the hands of designing and corrupt men, to improper tampering with members,

and the use of an extraneous, secret influence over an important branch of government. It may not corrupt all, but if it corrupts or tends to corrupt some, or if it deceives or tends to deceive or mislead some, that is sufficient to stamp its character with the seal of reprobation before a judicial tribunal." In the case of Rose v. Truax, 21 Barb. 361, the agreement was "to use his influence, efforts and labor in procuring the passage of a law by the" legislature; and the agreement was held void, as against public policy, and that, as the contract was entire, it was wholly void and that no recovery could be had for even legitimate services performed under the agreement. In the case of Weed v. Black, 2 MacArthur, 268, the court uses the following language: "If the terms of the contract be broad enough to cover services of any kind, whether secret or open, honest or dishonest, the law pronounces a ban upon the paper itself." In the case of Tool Co. v. Norris, 2 Wall. 45, Mr. Justice Field said in reference to agreements for compensation in procuring contracts from the government: "It [such principle] has been asserted in cases relating to agreements for compensation to procure legislation. These have been uniformly declared invalid, and the decisions have not turned upon the question whether improper influences were contemplated or used, but upon the corrupting tendency of the agreements." Further along in the opinion he says: "It is sufficient to observe generally that all agreements for pecuniary considerations to control the business operations of the government, or the regular administration of justice, or the appointments to public offices, or the ordinary course of legislation, are void, as against public policy, without reference to the question whether improper means are contemplated or used in their execution. The law looks to the general tendency of such agreements, and it closes the door to temptation, by refusing them recognition in any of the courts of the country." It will be observed that many of the decisions are based upon the corrupt tendency of such contracts, rather than the particular wording of the contract itself.

There are very eminent courts holding that contracts for the performance of services in procuring legislation can be enforced, where only fair and honorable means have been used, and especially when such legislation results in great public benefit. The plaintiff seeks

to bring his services within this rule, alleging that the plaintiff's services were not rendered for the benefit of any one individual, but that his services were rendered in securing the passage of a public act which restored lands to the public domain for the public benefit, to which the railroad companies had no right. It may well be doubted whether the legal effect of the passage of the law has been as alleged by plaintiff, viz. beneficial to the public at large; but we think it is plainly evident from the pleadings that it was not the public weal that concerned the plaintiff, in what he did, but to secure the passage of an act which would secure to the defendant the right to enter and pay for 160 acres of pine land for the paltry sum of $1.25 or $2.50 per acre, while the land was actually worth from $12,000 to $15,000, and for which services and expenses in so doing he was to be paid, as he claims, the sum of $3,500. Who was to pay this consideration? The plaintiff says that the defendant should do so, but, if the plaintiff was expending money and time and rendering services for the benefit of the public, why should this defendant alone be responsible therefor? And how the public could be benefited by the passage of a law allowing settlers to enter pine land for the sum of $200 or $400 per quarter section, which was worth $12,000 or more at the time, is not made to appear very satisfactorily. If there were a large amount of these lands which were taken in the manner secured by the defendant through plaintiff's agency, we think it is safe to say that the public were robbed, instead of being benefited. Prolific as have been the schemes for robbing the government of its pine timber, it is seldom that cases have come to the knowledge of our courts where such a gigantic fraud has been practiced in the name of a public benefit. It may be that the defendant's pocket is sweating with ill-gotten gains and public plunder, but this gives no legal cause of action against him by the plaintiff. We are reminded by the plaintiff that these lands had been for many years withdrawn from market for the benefit of certain railroads; that the railroads had forfeited their rights; that the secretary of the interior had so declared; but that there was evidently some doubt as to whether settlers upon these lands would have a right to prove up and acquire title to them without an act of congress so declaring. It was this doubt which led to the making of the contract sued upon in this action. It is immaterial that the courts subsequently decided that a certain settler upon these lands

could hold them under the order of the secretary of the interior made in 1887. The vice of the whole transaction rests in the lobbying influence exerted by the plaintiff in procuring national legislation to remove this doubt, and to enable the defendant to secure forthwith this valuable land for a nominal sum compared with its actual value. Neither party knew the defendant's legal rights to the land, if he had any. The plaintiff was not a legal practitioner, competent to advise upon such matters, but a lobbyist seeking to influence the votes of members of the national legislature during a period of from three to six months each year for four years. It is true that he alleges that he employed counsel to urge the passage of a bill declaring these lands forfeited to the government, and that parties who had settled upon them in good faith should have the preference; but it nowhere appears that either plaintiff or his attorney ever prepared a petition, map, or collected documents or evidence of any kind, or prepared a written argument or made an oral one; yet he alleges that he agreed with the defendant to do all that was necessary or could be done to bring the land into market, and enable the defendant to acquire title thereto, and that for such purpose he spent several months each year, for four years, in Washington, endeavoring to procure the passage of a law by congress giving the defendant the right to purchase the land occupied by him. The means employed are not particularly stated, but he accomplished his purpose. As it took the defendant several months each year, for a period of four years, to succeed, and the only means disclosed is that he went before the appropriate committees, we think that the unavoidable inference is that he solicited the personal aid of members of congress in doing all that was necessary or could be done to secure the passage of the law. The earmarks and taint about the whole transaction are too plain to be ignored and disregarded, and public policy demands that such contracts shall not be enforced. The case of Moyer v. Cantieny, 41 Minn. 242, 42 N. W. 1060, is cited by the plaintiff in support of his views of the law. Moyer was an attorney at law and was employed by Cantieny to procure from the government a pardon for Cantieny's son, who was imprisoned in the penitentiary for a term of years. Cantieny agreed to pay Moyer for his services, if successful in securing the pardon, the sum of $200. Moyer performed the services and was successful. The court upheld the contract upon several grounds; among others, that

it would be proper, and often expedient, that an attorney at law examine the case upon which the conviction was based, and see whether, notwithstanding the final judgment of the law, the case may not be of such a nature as to justify the extraordinary power of pardon. To the reasons given by the court in this case, we may add that the statute expressly provides that a person convicted of a crime may, by petition, apply to the governor for a pardon. Such petitioner is usually one who is confined in some prison and unable to present the petition personally to the governor. Not only this, but it is very seldom that such petition is made by one learned in the law; and it is therefore a legal right which a prisoner has, under such circumstances, to employ an attorney to prepare his petition, present it to the governor for pardon, and have such argument made in behalf of the petitioner as may be pertinent and advisable. As a petition and pardon are authorized by law, the presentation of a petition duly and legally prepared, accompanied by a legal argument in behalf of the petitioner showing the illegality of his confinement, or its injustice, and that public interests would not be violated by the granting to him of a pardon, cannot be a proceeding contrary to public policy, and certainly a contract for such purpose should not be declared void.

We do not condemn the attempts to secure legislation for legitimate purposes and in a legitimate manner. Many laws are passed solely for the public good by reason of the presentation of the proper evidence and arguments addressed to legislative bodies or the proper committees by outsiders, done openly, and without corrupting influences having been exercised. Frequently our educational, charitable, and humane laws are thus procured. There are also many just and meritorious private claims where, through the neglect or wrongful acts of the government, it would not be improper to present them for allowance and payment, and do so by fair argument and legitimate evidence. Many just individual claims have remained unpaid for years through the neglect of our legislative bodies to give them proper recognition, while corrupt legislation has enabled the lobbyist to succeed, to the injury of the public welfare, and deleterious to private morals. In the language of our constitution each person "ought to obtain justice freely and without purchase; completely and without denial; promptly and without delay, conformably to the laws" (article 1, § 8); but hiring

an agent to lobby a large portion of the year, during several years, in procuring legislation securing to an individual government lands for a comparatively small sum, worth more than $12,000, does not come within that class of contracts which is sanctioned by the law, and does not meet with our approval. The prevalent iniquitous system of lobbying with members of our legislative bodies and pub-lic officials is fast becoming a menace to our capacity for self-government. Courts can do but little to stop this most pernicious vice, because it is seldom that such cases come before them; but when they do appear, there should go forth from the judicial forum only rebuke, and the ban of disapproval.

The order for judgment in behalf of the defendant upon the pleadings in the court below is affirmed.