THEODORE HOLLISTER AND OTHERS v. AUGUST ULVI AND OTHERS.[1]

February 19, 1937.

No. 31,140.

[1]Reported in 271 N. W. 493.

O. J. Larson, R. J. Henning (E. L. Fogarty, J. E. McKenna, Lanners & Martini, C. J. Dodge, Leslie H. Blacklock, Thomas J. Doyle, R. Vern Eckman, Paul R. Hammerston, and Robert J. Karon, of Counsel), for appellants.

Theodore Hollister, N. B. Arnold, Austin Lathers and Jay H. Hoag, copartners as Lathers & Hoag, Ralph E. Burdick, H. S. Campbell, Frank Yetka, Hanford Cox, and V. J. Michaelson, respondents, pro se.

JULIUS J. OLSON, JUSTICE.

This appeal is from an order overruling appellants' general demurrer to respondents' petition in a suit brought by them pursuant to the provisions of the declaratory judgments act, 3 Mason Minn. St. 1934, § 9455-1, et seq., the court having certified that the question presented thereby is important and doubtful. As a matter of convenience we shall hereafter refer to respondents as plaintiffs and to appellants as defendants.

Plaintiffs are attorneys and counselors at law actively engaged in their chosen profession. That is also true as to defendants

Larson and Henning. Defendant Ulvi is one of the many persons who lost their all in the devastating fire that swept over the northerly wooded sections of our state in October, 1918. That fire was the cause of much subsequent litigation, most of which finally resulted in partial adjustments of the actual losses sustained by those affected thereby. Several cases involving that fire have been before this court. Anderson v. M. St. P. & S. S. M. Ry. Co. 146 Minn. 430, 179 N. W. 45 (second appeal will be found in 150 Minn. 530, 185 N. W. 299); Borsheim v. G. N. Ry. Co. 149 Minn. 210, 183 N. W. 519; Hall v. Davis, 150 Minn. 35, 184 N. W. 25. The facts upon which liability was determined will be found by reference to the cited cases. We therefore shall not attempt to restate them.

At and prior to the time of the fire mentioned the Director General of Railroads as the agent of the President was in charge of the operation of the railroads claimed to have been the cause of the fire. Acting as such, before he would permit any damages to be paid, he placed upon the parties suffering injury the burden of establishing liability and the extent of damage suffered by each such claimant. As a matter of fact liability was established in a great number of cases by actual court proceedings wherein liability was bitterly contested. In view of the very great number of people involved and the thousands of cases that would necessarily have to be tried, counsel for the various owners of destroyed property and counsel for the Director General of Railroads finally reached an agreement to the effect that when and as each claimant had established his loss, either by court action or by other proof deemed adequate by the Director General, the actual loss so suffered and sustained by each was then to be adjusted and finally settled upon a basis ranging all the way from 30 to 50 per cent of such actual loss. Because of the dire necessity existing and the extreme poverty resulting to the fire sufferers, they accepted these large discounts and finally accepted the adjustments as reached by counsel. But these people were, generally speaking, much dissatisfied, in fact rebellious, about the adjustment so reached. They claimed that the Director General had acted arbitrarily and harshly in dealing with them. As a consequence, agitation arose and associations were formed

with the object in view of finding suitable remedies whereby those who had suffered losses might accomplish an adjustment upon a more equitable basis.

Defendant Ulvi was one of the many whose loss had been determined by stipulation entered into between counsel. His actual damages were found and stipulated to be $5,511.80. Under the terms of the settlement, judgment was entered for 50 per cent thereof, that is to say, $2,755.90. The judgment so entered was thereafter duly paid. What has been said, we think, furnishes a sufficient background to the present cause.

Plaintiffs allege that they rendered professional services for and in behalf of defendant Ulvi pursuant to the terms of a written contract made February 20, 1930, reading as follows:

"I hereby retain and employ [naming counsel] as my attorneys to represent me in the prosecution, recovery and collection of any and all claims or demands of whatever nature that I may have against the U. S. Government or any of the agents or departments [thereof], arising from and on account of any damages suffered by me as a result of the Forest Fires of October, 1918, and in consideration thereof, and for such services as may be rendered by my said attorneys in that behalf, I hereby agree to pay my said attorneys out of any amounts recovered, a sum equal to 10% of such recovery, whether such recovery is obtained by suit, settlement or thru any other method.

"Description: Farm loss, St. Louis County."

Plaintiffs, pursuant to that contract and in conformity with their duties thereby assumed, then proceeded with the gathering, furnishing, and presenting of proof to the committees of Congress to which bills for the relief sought had been referred. As defendant Ulvi's lawyers and acting in his behalf (including many others similarly situated), plaintiffs assembled the facts and compiled the evidence that had been submitted to courts in cases tried where liability had been found sufficient as a matter of law to sustain recovery. They appeared before Congressional committees a great many times and presented and submitted proofs, facts, and argu-

ments to sustain defendant Ulvi's claim, including also the claims of their other clients, all of whom were similarly situated. As a result of these hearings and by reason of plaintiffs' professional services, the same extending over a period of years, Congress finally enacted Private Law No. 336 (c. 783) 74th Congress, approved by the President August 27, 1935. Under that act the Secretary of the Treasury is authorized and directed to pay these claimants (defendant Ulvi being one of them) "the amount of whose loss, on account of fire originating from the operation of railroads by the United States in the State of Minnesota on or about October 12, 1918, has been determined by court proceedings or by the Director General of Railroads, the difference between the amount of such loss so determined and the amount actually paid by the United States to such claimant less any amount paid to such claimant by any fire insurance company on account of such fire * * *." The act also provides that the Comptroller General "shall determine the amount due on any application, and the person entitled thereto under this Act, and shall certify such determination to the Secretary of the Treasury, which determination shall be final." Respecting the amount to be paid and the manner of its ascertainment, the act provides that the records of the Director General of Railroads "shall be conclusive evidence of the amount of any such loss, the amount paid by the United States, * * * and the amount paid by any insurance company with respect thereto." Also, the act provides that any person, or group of persons, "individually or collectively," who charges or attempts to charge, directly or indirectly, "any fee or other compensation for assisting in any manner any person in obtaining the benefits of this Act in excess of 10 per centum of the amount of the claim actually paid under this Act" shall suffer punishment by fine or imprisonment or both.

Plaintiffs aver that defendant Ulvi, notwithstanding his agreement and the performance by plaintiffs of the services therein provided for, has refused to execute forms of proof of loss prepared by them for submission to the Comptroller General. On the contrary, so plaintiffs say, Ulvi has employed the defendants Larson

and Henning and has agreed to pay them compensation instead of plaintiffs, who have performed the actual service; that Larson and Henning, in order to secure such employment from Ulvi, and to receive compensation therefor, have advised him that the contract made with petitioners is void and that he is not bound thereby nor is he liable to plaintiffs for the services rendered by them. They further charge that by virtue of the contract mentioned and the services rendered thereunder they have the right to demand and receive ten per cent of the amount to which Mr. Ulvi is entitled under the act, i. e., $275.59. They have notified the Comptroller General of their claim against Ulvi and have requested him to withhold payment of said sum until their rights might be determined in appropriate proceedings. By reason of the facts stated, judicial relief is sought under the declaratory judgments act. In that behalf they ask the court to construe the contract hereinbefore quoted; that the court adjudicate and determine the rights of the parties to the end that full determination and adjudication be made of the rights of all parties to this suit.

Defendants, in support of their demurrer, claim that it appears from the face of the petition that the contract therein pleaded "is null and void on either of the following grounds: (a) That it is contrary to public policy, (b) that it is in violation of USCA Title 31, § 203."

Defendants concede that their demurrer amounts only to an "objection that the facts alleged in the pleading against which it is directed, assuming them to be true in fact, are insufficient in law to require the demurrer to plead further." Also, that "facts of which the Court will take judicial notice may be considered in passing upon" the sufficiency of the pleading so attacked, and "that facts reasonably or necessarily inferred from the facts alleged are admitted by the demurrer." But, so they say, "In making these observations * * *, we do not mean to admit that the Court is not permitted to draw 'unavoidable inferences' from the allegations stated in the petition, such for example, that petitioners solicited personal aid of members of Congress to accomplish their purpose.

There is no such allegation in the petition, but * * * the omission * * * of such an allegation * * *, does not make the petition invulnerable" to such attack.

Their briefs and arguments, as might be expected from what we have quoted, are founded upon the claim that the contract here involved is in fact one calling for lobbying activities rather than professional service and as such is contrary to public policy, hence wholly void. To concur with them necessarily requires that the court hold that such it appears upon its face to be. Nowhere in the petition or in the contract itself is any service or activity promised by plaintiffs other than what may be entirely proper in performance of professional duty and service. Nothing of the type defendants deem objectionable appears in the record. Nor is there any allegation, as we read the record, from which permissible inferences may be drawn that the services to be performed thereunder include that of lobbying or the doing of any other act professionally improper.

Under our statutes, 2 Mason Minn. St. 1927, § 9470, "A party shall have an unrestricted right to agree with his attorney as to his compensation for services, and the measure and mode thereof." See also 1 Dunnell, Minn. Dig. (2 ed.) § 698a, and cases cited under notes.

Under the common-law rule in England contracts for contingent fees were condemned as champertous. That is still the rule in several of our states. But the general rule in the United States is that "the great weight of authority recognizes the validity of contracts for contingent fees, provided such contracts are not in contravention of public policy, and it is only when the attorney has taken advantage of the claimant by reason of his poverty, or the surrounding circumstances, to exact an unreasonable and unconscionable proportion of such claim that it is condemned. * * * Contracts for contingent fees are as much for the benefit of the client as for the attorney, because if the client has a meritorious cause of action, but no means with which to pay for legal services unless he can, with the sanction of the law, make a contract for a

contingent fee to be paid out of the proceeds of the litigation, he cannot obtain the services of a law-abiding attorney, and if perchance he should find one who would secretly make with him a contract in violation of the law, he might put himself in unsafe hands." 2 R. C. L. § 121, pp. 1039-1040.

We must not lose sight of the fact that an attorney is an officer of the court. As such—"It is his duty to act as a minister of justice and not as a quasi principal in litigation." 1 Dunnell, Minn. Dig. (2 ed. & Supps. 1932, 1934) § 664. The court has plenary and summary authority to control and protect the attorneys appearing therein, including as well their relations to suitors, to the end that no injustice be done and no overreaching by counsel of his client take place. *Id.* §§ 664, 666. Charest v. Bishop, 137 Minn. 102, 162 N. W. 1063; Landro v. G. N. Ry. Co. 122 Minn. 87, 141 N. W. 1103.

In passing upon the issues presented by the demurrer we may not act upon mere suspicion, or jump at what may be wholly unwarranted conclusions, that there must be something wrong with plaintiffs' contract or the rendition of services thereunder. Rather, we should start upon the theory that plaintiffs' petition and the contract they entered into with Ulvi are to be tested by proof in the usual course of trial upon the merits. Let the facts be shown. Then and then only may appropriate legal remedy be made applicable and determinative.

"In contracts between attorneys and clients the usual test would seem to apply that if a contract can by its terms be performed lawfully, it will be treated as legal, even if performed in an illegal manner; while, on the other hand, a contract entered into with intent to violate the law is illegal, even if the parties may, in performing it, depart from the contract and keep within the law. * * * A contract for purely professional services, such as drafting a petition for an act, attending to the taking of testimony, collecting facts, preparing arguments, and submitting them to the committee or other proper authority, etc., is, however, clearly valid, even though such services are to be performed for a contingent fee." 2 R. C. L. § 122, pp. 1041-1042.

While there are cases holding that contingent fee contracts for the collection of claims against the United States are void as against public policy, we think the saner and better rule is that "there is nothing illegal, immoral, or against public policy, in an agreement by an attorney at law to present and prosecute claims against the United States, either at a fixed compensation, or at a reasonable percentage on the amount recovered." *Id.* § 122, p. 1042. The test is: "does the contract, by its terms or by necessary implication, require the performance of acts which are of a corrupt character or which have a corrupting tendency." Stansell v. Roach, 147 Tenn. 183, 194, 246 S. W. 520, 523, 29 A. L. R. 143, 149.

■ In determining the validity, or lack thereof, of the present issue, it should be remembered that there is a clear distinction between contingent fee contracts having for their objective the procurement of what is generally termed "favor legislation" and legislation which provides means for settlements of debts or obligations founded either upon contract or violation of a generally recognized legal right. The cases, generally speaking, refer to this class as "debt legislation." In the latter kind of case a legislative body in considering such legislation sits in a quasi-judicial capacity. Contingent contracts for fees of attorneys in such cases are not condemned.

Defendants cite and strongly rely upon the following cases: Houlton v. Dunn, 60 Minn. 26, 61 N. W. 898, 30 L. R. A. 737, 51 A. S. R. 493; Noonan v. Gilbert, 63 App. D. C. 30, 68 F. (2d) 775; Gesellschaft, etc. v. Brown, 64 App. D. C. 357, 78 F. (2d) 410; Hazelton v. Sheckells, 202 U. S. 71, 26 S. Ct. 567, 50 L. ed. 939, 6 Ann. Cas. 217, and other cases of similar import. But these cases do not condemn contracts of the second class mentioned. Thus in Houlton v. Dunn the court said (60 Minn. 33):

"We do not condemn the attempts to secure legislation for legitimate purposes and in a legitimate manner. * * * Frequently our educational, charitable, and humane laws are thus procured. There are also many just and meritorious private claims where, through the neglect or wrongful acts of the government, it would

not be improper to present them for allowance and payment, and do so by fair argument and legitimate evidence. Many just individual claims have remained unpaid for years through the neglect of our legislative bodies to give them proper recognition, while corrupt legislation has enabled the lobbyist to succeed, to the injury of the public welfare, and deleterious to private morals."

In Gesellschaft, etc. v. Brown, 64 App. D. C. 357, 78 F. (2d) 410, 413, 414, the court made this significant statement:

"It must, however, not be understood that we are holding all contingent fee contracts for the enforcement of claims against the government, or even for the procuring of legislation, void as against public policy. There is a sharp distinction between contingent-fee contracts for the prosecution of claims against the government which are in the nature of debts or contract claims, and contingent contracts for procuring favors through contracts from the heads of government departments, or the procuring of general remedial legislation, authorizing a contract or granting advantages or benefits to which, prior to the enactment, the contractor has no existing legal claim. In the latter instance such contracts are held void as against public policy. In the former the head of a department or Congress acts in a quasi-judicial capacity in adjusting an individual debt or claim. Services rendered for the claimant in petitioning and appearing before the officers of the government or committees of Congress are as professional as appearing in a court of justice."

And further (p. 414) quoting from Wright v. Tebbitts, 91 U. S. 252, 253, 23 L. ed. 320:

"To deprive a claimant of the means of obtaining such professional service would be to deprive him, in many instances, of the means of asserting and enforcing his claim."

■ But, defendants say, the contract here provides for compensation, "whether such recovery is obtained by suit, settlement, *or through any other method.*" The italicized portion is that to which they point as an earmark of lobbying activity. We are not passing

upon what might appear at the trial. If we were to construe the italicized language as defendants would have us do, we would have to read into the clause something that does not appear upon its face. In other words, we would have to supply the word "illegal" or its equivalent. In view of the fact that contracts are generally considered to express what may be accomplished by lawful means, and illegality is never presumed, we cannot, in the face of a mere demurrer and without any proof, say, as a matter of law, that the contract here involved is subject to the charge directed by defendants against it.

"No court should hesitate to declare void any agreement or contract to corrupt or improperly influence the official conduct of any public servant, but it is an equally sound principle which leads courts to declare that before applying such remedy, and permitting one who has received a valuable consideration for a promise fair upon its face to escape its performance by pleading the invalidity of his own agreement, such fatal defect therein must be so clear as to be free from doubt. (Citing cases.)  *  *  *  'the power of courts to declare a contract void for being in contravention of sound public policy is a very delicate and undefined power, and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.'  *  *  *  So long as the corrupting or impolitic character of the agreement is not so clear as to be readily apparent to the intelligent and impartial mind, the just principles of the law, which hold every man to a fair and full performance of his contract, ought not be made to yield to any doubtful construction of that somewhat variable and altogether undefined thing which we call public policy. While protecting the interests of the public, the rights and interests of individuals are not to be unnecessarily sacrificed." Cole v. Brown-Hurley Hardware Co. 139 Iowa, 487, 490, 491, 117 N. W. 746, 747, 18 L.R.A.(N.S.) 1161, 16 Ann. Cas. 846.

In Richardson v. Mellish, 2 Bing. 229, 252, the court, speaking of public policy, said: "it is a very unruly horse, and when once you get astride it you never know where it will carry you. It may

lead you from the sound law. It is never argued at all but when other points fail."

■ Much is made by defendants of the claimed fact that Ulvi's claim against the government was not a "legal" one. It is true that the claim could not be enforced as against the government because it was and is immune to suit. But under the Transportation Act, 41 St. 462, c. 91, § 206(e), as amended, 49 USCA, § 74(e), it was the duty of the Director General to pay obligations of this nature when reduced to final judgment, the statute providing that such should "be promptly paid out of the revolving fund" pursuant to the provisions of § 210. Highly important too is the fact that the Congress in passing said Private Law No. 336, U. S. St. 1935, c. 783 (the Act here involved), recognized its obligation to Mr. Ulvi and others similarly situated. The existence of just and meritorious claims, founded upon legal liability (established by court proceedings or by the Director General) is the foundation for the promised payments. Only the claimant whose loss has been so determined is to be paid "the difference between the amount of such loss so determined and the amount actually paid" when settlement was had.

The reports of the Committees on Claims in both House and Senate (to which the bills were sent for investigation and report) fully sustain this interpretation as the basis for the act. In House Report No. 255, 74th Congress, 1st Session, it is said:

"Taking a broad view of the entire situation and considering the result of all the trials had at the time settlement was proposed, *we think it may be fairly stated that legal liability of the Railroad Administration for the entire damage throughout the area embraced in the settlements had been established by the courts of Minnesota.* The Railway Administration took the position that they could pay no claims until legal liability was established. * * *

"After many negotiations between the Railway Administration and State and Federal officials, the Railway Administration finally offered the claimants in the city of Cloquet 50 percent of their losses without interest costs or other charges, and made it a condition precedent to the payment of 1 dollar to any claimant, that

the 278 claimants who had judgments or were entitled to judgment, should first sign agreements to take 50 percent of their net loss without interest or costs. Not only were all of the 278 claimants required to do this but all claimants in the city of Cloquet were required to make a 50-percent settlement. The Railway Administration said that proposition was final; they [the claimants] could 'take it or leave it.'

· "The claimants had no alternative, they were destitute, and were compelled to accept the terms and settlement offered them.  *  *  * Thousands of these claimants were homeless and in need; they were in no position to undergo the ordeal of long-drawn-out and expensive litigation; they had no assurance they would be paid if they tried their cases and secured judgments. The Railway Administration had already refused to pay judgments affirmed by the supreme court. There was no alternative but to accept what was offered them.  *  *  *

"The City of Cloquet was completely destroyed—it was a 100-percent loss. The courts of Minnesota held the Railway Administration responsible for that loss. *A payment of 50 percent of the loss was only a partial payment of a fixed judicial liability.*" (Italics supplied.)

From the quotations made we think it is clear that the government recognized by the passage of the act that claimants had property rights violated by the Director General while in possession and control of the affairs of railways; that legal remedy then existed and was employed fixing liability; that because of the Director General's autocratic conduct and the dire need of these claimants who had suffered damages, settlements were made upon a percentage basis of the actual loss sustained. The act is obviously designed to make up the difference between the unfair and unjust settlements made and the actual losses sustained by the claimants.

We think the authorities generally sustain plaintiffs' claim that this is "debt legislation" as distinguished from "favor legislation." The following cases, among a great number, are of interest, and helpful:  Mills v. Stewart, 76 Mont. 429, 247 P. 332, 47 A. L. R. 424;

Wylie v. Coxe, 56 U. S. 415, 14 L. ed. 753; Wright v. Tebbitts, 91 U. S. 252, 23 L. ed. 320; Stanton v. Embrey, 93 U. S. 548, 23 L. ed. 983; Taylor v. Bemiss, 110 U. S. 42, 3 S. Ct. 441, 28 L. ed. 64; Spalding v. Mason, 161 U. S. 375, 16 S. Ct. 592, 40 L. ed. 738; Valdes v. Larrinaga, 233 U. S. 705, 34 S. Ct. 750, 58 L. ed. 1163; Winton v. Amos, 255 U. S. 373, 41 S. Ct. 342, 65 L. ed. 684; Capital Trust Co. v. Calhoun, 250 U. S. 208, 39 S. Ct. 486, 63 L. ed. 942. In Trist v. Child, 88 U. S. 441, 22 L. ed. 623, the opinion carefully distinguishes between lobbying contracts and contracts for professional services.

We think that as against a demurrer the petition cannot be said to be vulnerable upon this ground.

■ The second point raised by defendants, namely, that the contract is void because violative of 31 USCA, § 203, cannot be sustained. That section prohibits transfers and assignments of any claim upon the United States, or of any part or share thereof, or interest therein, whether absolute or conditional, and whatever may be the consideration therefor. The present act permits a charge not exceeding ten per cent for the kind of services rendered by plaintiffs. Obviously it was within the power of Congress to limit attorneys' fees. Capital Trust Co. v. Calhoun, 250 U. S. 208, 39 S. Ct. 486, 63 L. ed. 942. Having so limited the same and the contract here involved being within the limits of the act, it would be a far cry to say that therefore the contract is void. Not to be ignored is the language of the act permitting assignees to come in and share in the benefits provided thereby. (See § 1 of act.)

What has been said disposes of all issues raised. Naturally we have not considered others, if such there are.

Order affirmed.

Mr. Justice Stone took no part in the consideration or decision of this case.