MAURICE WEINSTEIN v. JACK PALMER, SOLE TRADER, d. b. a. LA VOGUE AND/OR LA VOGUE SHOP.[1]

April 9, 1948.

Nos. 34,573, 34,584.

*Gallagher, Farrish & Sheran,* for plaintiff appellant.
*Wilson, Blethen & Ogle,* for defendant appellant.

Magney, Justice.

The court directed a verdict for defendant on plaintiff's claim and for plaintiff on defendant's counterclaim. Plaintiff appealed from an order denying his alternative motion for judgment or a new trial, and defendant appealed from an order denying his motion for a new trial.

Plaintiff is an attorney at law, with offices in Milwaukee, Wisconsin. He is also a public accountant registered in Minnesota and Wisconsin. Defendant owns and operates a ladies' apparel shop in Mankato.

The federal Office of Price Administration (hereinafter referred to as OPA) had issued and made its order No. 330 determining the ceiling price at which defendant and others in his line of business could sell to their trade. During the period from February 24, 1943, to August 31, 1943, defendant sold certain coats, suits, and dresses at a price in excess of the ceiling prices fixed for such garments as

set out by the regulations in said order No. 330. By reason thereof, defendant was liable and subject to the penalties prescribed by the statute creating the agency. On or about September 2, 1943, defendant employed plaintiff, as an attorney and accountant, to bring about the reduction of said penalties, to adjust matters between defendant and the OPA, and to secure a revision of ceiling prices. The compensation terms of the employment contract, which were reduced to writing, were as follows:

"This will confirm our understanding relative to the basis upon which I am to represent you in connection with the O. P. A. Regulations No. 330.

"In addition to the retainer fee of $500.00 which I received on September 2, 1943, I am to receive 15 per cent of the difference between the maximum violations and the amount actually settled for with the Office of Price Administration. Payment of this additional fee is to be paid upon settlement of this matter."

This instrument was signed by plaintiff and approved by defendant. Plaintiff claims that he performed the services contemplated by the contract, and he asks payment of his fees. Defendant refuses to pay. This action is the result. In his answer, defendant sets out that plaintiff induced him to enter into the contract by untrue and fraudulent representations made for the purpose of defrauding defendant. He claims that, because of the statement so made by plaintiff, he was "put in great nervous distress and strain and subjected to great worry and anxiety." Defendant further claims that, believing and relying upon the false and untruthful representations made by plaintiff, he paid plaintiff $500 in cash and signed the contract of employment. He claims that the services of plaintiff were of small or no value and that plaintiff therefore is not entitled to a recovery. In a counterclaim he seeks repayment of the $500 paid as retainer. There is no allegation in defendant's answer that the contract of employment is illegal and contrary to public policy. This question first arose after plaintiff rested. The basis for the direction of the verdict in favor of defendant, as stated by the court, was that the contract of employment was illegal and contrary to public policy,

and the basis for the direction of the verdict for plaintiff on defendant's counterclaim was, as stated by the court, that plaintiff had really performed some service of value for defendant and that in all fairness plaintiff should be permitted to keep the retainer.

Plaintiff, at the time in question, was giving special attention to tax work and matters in connection with OPA regulations. He had done such work for a Walter Leeser of Minneapolis. On August 13, 1943, OPA representatives checked defendant's operations and informed him that he had violated OPA regulations. They said that they would turn their findings over to the enforcement division. Defendant had learned that Leeser had had similar problems and that plaintiff had handled his matters. Leeser recommended plaintiff to defendant. Plaintiff, defendant, and Leeser met at the Radisson Hotel in Minneapolis. Defendant testified:

"* * * I * * * told him that I had been checked by the OPA, and, that much to my surprise we were found in violation, I believe at that time the OPA men found that I was in violation up to $3,000, a little better than $3,000, * * * and I was greatly surprised that we found ourselves with some $3,000 of violations on our hands."

Defendant wanted to know if plaintiff would take care of his matters also. Defendant gave plaintiff a detailed statement of the facts. Then, defendant said, plaintiff outlined defendant's position with the OPA. He said first of all that "they [OPA] could make these * * * low ceilings * * * stick" and that they could collect treble damages; that they could get an injunction against defendant, and, if they wanted to, they could instigate criminal proceedings. Defendant testified:

"* * * you see, the thing which I was worried about at that time was not so much the violations, but it was the fact if these ceilings were to stick then I was out of business, I just could not operate under those conditions."

He was alarmed about these things and also about his personal reputation. Plaintiff told defendant that he was equipped to take care of his affairs and that he wanted defendant to furnish him

records and figures relating to the overcharges. After some discussion, they agreed upon a fee of 15 percent as set out in the memorandum. They drove to Mankato that night. Next morning, plaintiff went over the records with defendant's auditors, McLean & Kuhlman.

Before defendant employed plaintiff he knew of OPA order No. 330. He had received a copy at least a month before he saw plaintiff and knew its provisions concerning violations of the regulations. He was asked:

"Q. I call your attention to the following portion of the regulation: Persons violating any provision of this regulation are subject to criminal penalties, civil enforcement actions, proceedings for the suspension of licenses and suits for treble damages provided by Emergency Price Control Act of 1942, as amended. Now, having called your attention to that section, I will ask if you read that section?

"A. I must have, Mr. Sheran.

"Q. And you understood that to mean in a general way that, in the event you should sell your goods for more than the ceiling that you would be subjected to whatever penalties were referred to in that section of the order, is that correct?

"A. Yes, I assume that I interpreted it that way."

In view of this testimony given by defendant himself and his testimony as to what he claims plaintiff told him at the time the agreement of employment was entered into, there is very little or no substance in his claim that he was induced to enter into the contract because of false representations made by plaintiff to him as to the penalties he was subject to because of his admitted violations of the OPA regulations. We shall not discuss any further this feature of the case.

OPA regulation No. 330 was promulgated February 18, 1943, effective February 24, 1943. It set out what the merchant was required to do in determining his ceiling price under the regulation. To detail this procedure here is not necessary. Under the regulations, defendant was required to have posted, on or before September 1, 1943, in his place of business, a price chart giving the ceiling

price. Defendant had no such chart, and plaintiff was to prepare one. Defendant's auditors and a store employe were to gather the information from which the chart would be prepared. From Mankato, plaintiff notified the enforcement attorney for OPA in St. Paul that he had been retained by defendant. Next day, upon his return from Mankato, he told the attorney and the OPA investigators that he would get all the figures and submit same to them. Shortly after September 16 he received the statements and records from defendant's auditors. They figured total overcharges from February 24, 1943, to August 13, 1943, to be $3,184.58. Plaintiff found the total overcharges to be $4,630.42 up to September 1, 1943, the date to which they should have been calculated. Plaintiff then prepared a schedule adjusting the 1941 prices to a fair markup. He testified:

"* * * Mr. Palmer was selling goods at a much lower price than other merchants were doing at the same time, and that if he was required to operate on the 1941 basis he could not operate in 1943, and if he used the 1943 basis compared to his 1941 basis, he would then be subject to a violation of $4,600, that amount of penalties, three times."

After plaintiff had completed computation of the figures furnished him and on September 22 he had a conference with the OPA officials in St. Paul. They went over the figures. Next day he saw them again and tried to convince them upon the figures that defendant should be entitled to a higher ceiling, so that he could operate at a fair profit in comparison with what the merchants were getting in a similar business. Thereupon, plaintiff and the officials tentatively agreed upon new ceiling prices. Defendant then went to Minneapolis. Plaintiff outlined what he thought he could get the OPA to agree to, and defendant said: "* * * if that is the best you can do, go ahead and do it." Next day the OPA officials were given the final figures based upon the temporary work sheet. They stated that they would "accept it on that basis." Upon his return to Milwaukee, plaintiff spent three days setting up the proper charts with the new figures. Two charts were set up, one showing the new ceiling prices in accordance with the understanding with the OPA officials, and

the other setting out what the overcharges would be based upon the new figures. One of each was sent to defendant and the OPA officials. The new basis reduced the overcharges from $4,630.42 to $264.85. Defendant was also given an increase in ceiling prices, which, retroactively to February 24, 1943, the date when the regulations became effective, materially reduced his violations. The charts were sent to defendant on September 30. He promptly mailed his check for $264.85 to the United States treasurer. The receipt indicates that the OPA accepted the payment in full settlement of all violations up to September 1, 1943. Defendant was not satisfied, as he wanted additional increases in ceiling prices, which plaintiff told him was not possible.

At the time plaintiff was employed by defendant, defendant's customers had a cause of action against him for $50, or for treble damages, whichever was greater. The only civil cause of action which the government had against defendant was an injunction suit to prevent him from continuing with his business. A criminal action for wilful violation might have been brought by the government against defendant.

From the above statements, despite defendant's contention to the contrary, it is apparent that he benefited greatly from the services performed by plaintiff. His violations were reduced from $4,630.42 to $264.85, in itself a sizable relief. The payment of $264.85 settled all violations up to September 1, 1943. He was given increased ceiling prices, which permitted him to stay in business. These ceiling prices, being retroactive, might operate to prevent customers from bringing actions for treble damages. We are only calling attention to this situation, not determining the question. Defendant himself testified that under the old ceiling prices he could not stay in business. The charts required by law were prepared for him. No criminal action was brought by the government, as the payment of $264.85 was in settlement of all violations up to September 1, 1943. It appears to us that defendant has no cause for complaint on the score of nonbenefit. The result of plaintiff's activities benefited defendant very materially. He received practically everything he bar-

gained for. As far as can be seen from the record, his troubles vanished. The trial court in granting plaintiff's motion for a directed verdict on the counterclaim to recover back the retainer fee did so on the basis of some value received by defendant in the raising of his ceiling. It thus recognized that the services performed by plaintiff for defendant were of value.

The trial court, however, directed a verdict for defendant on plaintiff's cause of action on the ground that the contract between plaintiff and defendant was an illegal contract and therefore void.

This court has passed on the question of the legality of a contract between an attorney and a client where the attorney agreed to collect a claim against the United States government on a contingent fee basis. Hollister v. Ulvi, 199 Minn. 269, 271 N. W. 493. This court held the contract valid. The plaintiffs in that case gathered proofs to sustain the claim of their clients. They appeared before congressional committees numerous times and presented and submitted facts and arguments to sustain their clients' claims and that of many others in a similar situation. As a result of these efforts and by reason of plaintiffs' professional services, congress finally enacted the law which gave defendant Ulvi relief. In Nutt v. Knut, 200 U. S. 12, 26 S. Ct. 216, 50 L. ed. 348, an attorney was employed to prosecute a claim against the United States. The contract, which was in writing, provided that he should prosecute it before the courts, officers, and departments of the government and congress, and that he should receive as compensation a sum equal to a specified percentage of the amount allowed. Collection was made. The supreme court of Mississippi held that it was not a contract for lobbying services. The United States Supreme Court stated (200 U. S. 22, 26 S. Ct. 220, 50 L. ed. 353) : "* * * the Supreme Court of Mississippi held that the record did not establish such a case, and we accept that view of the evidence in the cause."

In 12 Am. Jur., Contracts, § 204, it is stated:

"* * * The cases are in general accord in holding that all agreements stipulating for the performance of lobbying services, in the sense of exerting private or personal influence with members of the

legislature, or in interviewing or bringing pressure to bear on them, outside of the legislative halls, or which by their terms imply that such services are to be rendered are void as contrary to sound legislation and public policy."

And in § 205 the text goes on:

"* * * It seems, however, that the tendency of the courts is to break away from the strict rule that if the compensation is contingent upon the success of the undertaking to secure legislation, the agreement is void on its face, and to adopt the view that if nothing improper or immoral was contemplated by the parties at the time the agreement was entered into, and the services rendered thereunder did not partake of anything in the nature of lobbying or other improper influences, the mere fact of the contingency of the compensation does not of itself make the agreement void. The cases in which the validity of agreements providing for contingent compensation are upheld are generally those in which a person has been employed to render legitimate professional services in furthering the enactment of legislation. * * * Another reason which has been given is that the right of an attorney at law to render services in court for a contingent fee is almost universally recognized, that the temptation to resort to improper means before the judiciary is just as strong as it is to resort to such means before the legislative or executive branch of the government, and that it cannot be assumed that such means would be more effective in one department than in the other."

The instant case does not involve "lobbying services." Here plaintiff, an attorney and expert accountant, was employed to secure relief for a client, who because of violations of OPA regulations was in serious difficulty and who, if forced to operate under a ceiling of prices already established, would be forced out of business. The OPA agent and its enforcement attorneys were in charge of all these matters and were therefore the persons to whom the matters would have to be presented in order to obtain relief. The unfairness of the situation as far as defendant was concerned required adjust-

ment as a matter of right and not of favor. We have already detailed the contract and the acts performed by plaintiff to secure the rights and relief to which defendant claimed he was entitled.

In 12 Am. Jur., Contracts, § 206, where contracts involving dealings with administrative officers such as are involved in the instant case are discussed, it is stated:

"While the courts often profess to test the validity of agreements to influence administrative officers by the same rules by which the validity of lobbying agreements are tested, the actual results reached indicate a greater tendency to uphold these agreements. The legality of agreements to influence administrative or executive officers or departments is to be determined in each case by weighing all the elements involved and then deciding whether the inherent tendency of the agreement is to invite or promote the use of sinister or corrupt means to accomplish the end or to bring influences to bear upon public officials of any other nature than the single one of genuine advantage to the government. Therefore, only very general rules can be laid down by which these agreements are to be tested; and in the last analysis most cases will turn upon facts peculiar to each respectively. However, beyond question, any agreement entered into because of the actual or supposed influence which the employee has, engaging him to influence administrative or executive officers in the discharge of their duties, which contemplates the use of personal influence and personal solicitation rather than any appeal to the judgment of the officer on the merits of the object sought, is contrary to public policy and void. * * * An agreement to render proper professional services in connection with influencing the action of public officers is not illegal. The fact that an agreement has for its object the obtaining of contracts through government officials does not give rise to a presumption that corrupt or improper influences are to be resorted to or that the undertaking will injuriously affect or subvert the public interest. Indeed, the rule that presumptions in human affairs are in favor of innocence rather than of guilt applies in testing these agreements."

In Trist v. Child, 88 U. S. (Wall.) 441, 450, 22 L. ed. 623, 624, the court said:

"* * * We entertain no doubt that in such cases, as under all other circumstances, an agreement express or implied for purely professional services is valid. Within this category are included, drafting the petition to set forth the claim, attending to the taking of testimony, collecting facts, preparing arguments, and submitting them orally or in writing, to a committee or other proper authority, and other services of like character. All these things are intended to reach only the reason of those sought to be influenced. They rest on the same principle of ethics as professional services rendered in a court of justice, and are no more exceptionable. But such services are separated by a broad line of demarcation from personal solicitation, and the other means and appliances which the correspondence shows were resorted to in this case."

See, also, Oscanyan v. Arms Co. 103 U. S. 261, 26 L. ed. 539.

In the instant case, the agreement contemplated the rendering of professional legal and accounting services. Plaintiff was employed because of his experience along those lines. At the very first meeting of the parties and at Mankato the following day, the conversation between the parties centered on the gathering and assembling of accounting data to be presented to the OPA officials. Defendant's local accountants and his employes went over defendant's records and presented their tabulations to plaintiff for analysis. The OPA officials were asked to act not on any personal basis nor by personal pressure, but upon the calculations presented to them, worked out by plaintiff from defendant's books and records, on a basis of reason only.

In Wells v. Floody, 155 Minn. 126, 129, 192 N. W. 939, 940, 33 A. L. R. 776, we said:

"One who is under an investigation which may result in an indictment may present to the investigating officers evidence tending to show that he is not guilty of an offense, and that the prosecution is without foundation or constitutes blackmail. He may hire an-

other, lawyer or layman, to investigate and present the results of his investigations, or to get and present evidence, and to make arguments based on such investigations or such evidence, to the end that an indictment will not be presented, and that the prosecution be ended. A contract to do service of this kind for one accused offends no public policy of the state. * * * A like rule applies to contracts to induce legislation. Contracts which contemplate no more than the presentation of arguments in favor of legislation are not forbidden; but contracts contemplating personal solicitation and the use of personal influence offend public policy."

The fact that plaintiff here was to receive part of his fee on a contingent basis, depending upon the success of his efforts, is not sufficient to vitiate the contract. In 12 Am. Jur., Contracts, § 207, it is stated:

"Because of their baneful tendency, agreements by which persons are employed for a compensation contingent upon success, to secure contracts, concessions, etc., from the government, or to procure some action on the part of administrative or executive officers of the government have been declared void by some leading authorities, without any inquiry as to whether personal solicitation or personal influence were intended to be, or were in fact, a factor in the attainment of the desired end. [Citing Crocker v. United States, 240 U. S. 74, 36 S. Ct. 245, 60 L. ed. 533, in note 1.] However, the more generally accepted view is that an agreement of employment in which compensation is contingent upon success in securing contracts, concessions, etc., from the government through its officers is not illegal merely because of the character of the compensation."

In the late case of Hall v. Anderson, 18 Wash. (2d) 625, 140 P. (2d) 266, 148 A. L. R. 760, it was held that a contract between an attorney and a contractor whereby the attorney, for a contingent fee, agreed to try to persuade public officials by legal means to award a contract to the contractor, who was the low bidder, on the merits of his bid, was not void as against public policy. The government had threatened to award the contract to another. The attorney, if suc-

cessful, was to receive one-half of one percent of the amount of the contract bid. He went to Washington and, in the words of the complaint (18 Wash. [2d] 629, 140 P. [2d] 268, [269]), "proceeded to urge upon various members of the War Department the propriety, fairness and justice of accepting on its merits" the contractor's bid and awarding the contract to him. The contract was thereupon awarded to the contractor, who refused to pay the attorney. The Washington court quoted with approval the following note in 46 A. L. R. 196:

"* * * In other words, the law only strikes down those contracts which contemplate the use of secret, sinister influences—those which contemplate that the support of the desired measure shall be secured as a favor from the legislator, induced by personal reasons or friendship, rather than by an appeal to the judgment. There is in reason more basis for upholding contracts to influence the various executive and administrative officers and departments than for upholding 'lobbying contracts,' so-called, particularly where (and this is the most common instance of such contracts) the contract is an employment to act as agent or representative in an endeavor to secure government contracts. This is true not only because the transaction is one in which an agent would commonly be employed were both principals, private individuals, but also because the official whose favorable action is sought—at least, if the employment is for the purpose of securing a government contract, or making a sale to the government—is charged with the specific duty of letting contracts or making purchases, and in a better position to judge the merits of the agent's proposal, and less likely to be susceptible to personal influence, than would be an individual legislator, who often would not have an opportunity to investigate the merits of a proposed measure. And while the courts often profess to test the validity of contracts to influence administrative officers by the same rules by which the validity of lobbying contracts are tested * * * the actual results reached indicate a greater tendency to uphold these contracts. And this is true notwithstanding the decision of the United States Supreme Court in Providence Tool Co. v. Norris (1865)

2 Wall. (U. S.) 45, 17 L. ed. 868, which in sweeping terms declared all agreements for compensation to procure government contracts void."

The Washington court also stated (18 Wash. [2d] 634, 635, 140 P. [2d] 270, 271):

"* * * It will not do to hold that public policy forbids one to employ an agent to represent him in dealing with the government when, as far as the facts show, the employment contemplates an appeal to the government agency on the merits, as distinguished from the use of some species of direct or oblique personal influence.

\* \* \* \* \*

"* * * we see nothing in the terms of the contract pleaded, or in its tendency, or in the means to be employed in its execution, which requires the performance of acts corrupt in themselves. The contract could conceivably have been lawfully performed without engaging in any act or practice which was contrary to the public morals or the public welfare. * * *

\* \* \* \* \*

"* * * The allegation of the complaint is that the defendant employed the plaintiff to 'urge and persuade,' nothing more. There is nothing sinister in employing an attorney to urge and persuade. Every attorney who comes to this court—and some are employed on contingent fees—is employed to do that very thing."

So in this case, the employment of plaintiff contemplated an appeal to the OPA officials "on the merits." Defendant's petition for relief from the unfortunate position in which he found himself was fortified with facts and figures which should and did appeal to the judgment of those officials, and resulted in rulings which they thought defendant was entitled to, not on the basis of personal favor, but on the merits. The only complaint defendant had at the time was that he felt that he was entitled to more relief. We see nothing in the contract or in its performance that would justify us in holding it contrary to public policy and therefore void.

The employment contract provided that plaintiff was to receive for his services "15 per cent of the difference between the maximum violations and the amount actually settled for with the Office of Price Administration." Plaintiff seeks recovery of 15 percent of the difference between three times the actual overcharges and the amount actually settled for. The contract does not use the phrase "three times the maximum violations." It says "maximum violations." This does not mean three times "maximum violations."

In our opinion, the trial court erred in directing a verdict for defendant on plaintiff's cause of action. Defendant testified that at one time he was ready to pay plaintiff the sum of $654.83, which represents 15 percent of the difference between the maximum violation and the amount actually settled for with the OPA. He was asked: "That was what you understood you owed him?" and he answered: "That's right."

Since in our opinion the contract was not void because of illegality and plaintiff had performed the contract and since no illegal means or methods were used by plaintiff in its performance, he is entitled to a recovery in the sum of $654.83. On plaintiff's appeal, the order is reversed with directions to enter judgment for plaintiff in the sum of $654.83. Order affirmed on defendant's appeal.

So ordered.

MR. JUSTICE FRANK T. GALLAGHER took no part in the consideration or decision of this case.